ACCEPTED
13-14-00581-CV
THIRTEENTH COURT OF APPEAL
CORPUS CHRISTI, TEXAS
12/29/2014 10:41:14 PM
DORIAN RAMIREZ
CLERK

NO. 13-14-00581-CV

FILED IN
13th COURT OF APPEALS
CORPUS CHRISTI/EDINBURG, TEXAS
12/29/2014 10:41:14 PM
DORIAN E. RAMIREZ
Clerk

# IN THE COURT OF APPEALS
## FOR THE THIRTEENTH JUDICIAL DISTRICT
## CORPUS CHRISTI, TEXAS

GUADALUPE "LUPE" RIVERA,
APPELLANT/CROSS-APPELLEE

V.

LETICIA "LETTY" LOPEZ,
APPELLEE/CROSS-APPELLANT

*ON APPEAL FROM THE 370TH JUDICIAL DISTRICT COURT
OF HIDALGO COUNTY, TEXAS; NO. C-6914-13-G*

## BRIEF OF CROSS-APPELLANT LETICIA LOPEZ

Jerad Najvar
NAJVAR LAW FIRM
Texas Bar No. 24068079
4151 Southwest Freeway, Suite 625
Houston, Texas 77027
Phone: (281) 404-4696
Fax: (281) 582-4138
Email: jerad@najvarlaw.com

*Counsel for Appellee/Cross-Appellant*

December 29, 2014

## IDENTITY OF PARTIES AND COUNSEL

**Appellant/Cross-Appellee**:

Guadalupe "Lupe" Rivera, Sr.

*Counsel for Appellant/Cross-Appellee*:

Gilberto Hinojosa
GILBERTO HINOJOSA & ASSOCIATES, PC
622 E. St. Charles Street
Brownsville, Texas 78520

**Appellee/Cross-Appellant**:

Leticia "Letty" Lopez

*Counsel for Appellee/Cross-Appellant*:

Jerad Najvar
NAJVAR LAW FIRM
4151 Southwest Freeway, Suite 625
Houston, Texas 77027

# TABLE OF CONTENTS

Identity of Parties and Counsel ........................................................................i

Index of Authorities ......................................................................................iv

Statement of the Case.................................................................................. vii

Issues Presented for Review ........................................................................ viii

Statement of Facts ..........................................................................................1

Summary of the Argument...........................................................................17

Argument.....................................................................................................19

  I.  Standard of Review of Election Contests .........................................19

      A. Scope of Election Contest Inquiry.............................................19
      B. Standard of Review on Appeal..................................................21

  II.  The Trial Court Abused Its Discretion by Failing to Invalidate Additional Votes, Because Lopez Proved as a Matter of Law That Additional Votes Were Cast by Persons Not Residing in District 5.........................................22

      A. Legal sufficiency review of issues upon which Lopez had the burden of proof at trial .....................................................................22
      B. Residency under the Election Code........................................23
      C. Lopez proved as a matter of law that Lupe Jr. and Illiana Guerrero were not eligible to vote because they do not reside in District 5, and that they cast votes for Rivera in the election .................................................27

          1.  Undisputed facts establish that Lupe Rivera, Jr. and Illiana Guerrero have bodily presence in a residence outside District 5....................28
          2.  Undisputed facts establish that Lupe Jr. and Illiana Guerrero have a present intention to reside at 700 E. Eighth, not 716 N. Padre ........32
          3.  Lupe Jr. and Illiana Guerrero cast their votes for Rivera .................38

      D. Lopez proved as a matter of law that an additional nine ballots were illegally cast by voters who resided outside District 5 .............................40

      1. 316 West Los Torritos ........................................................40
      2. 1518 East Sixth ...............................................................45

  E. Lopez proved as a matter of law that Esteban Martinez cast an illegal ballot for Rivera................................................................48

III. The Trial Court Abused its Discretion by Deducting Certain Illegal Votes From Lopez's Final Vote Count Because There is Insufficient Evidence to Support That Those Votes Were Cast for Lopez...............................................50

  A. Factual sufficiency review of issues upon which Lopez did not have the burden of proof at trial...............................................50
  B. The confidential nature of the electoral process requires heightened review of suspicious and biased voter testimony .....................................51
  C. The record shows that basing any finding on the testimony of Tomasa Cavazos is clear error ..............................................52
  D. The record shows that basing any finding on the testimony of Jose Jr. and Jose Sr. is clear error ...............................................55

IV. The Trial Court Abused its Discretion by Subtracting Four Undervotes, Rather Than One, From the Total of Illegal but Undetermined Votes Cast in the Election ...............................................56

Prayer ...............................................................................59

Certificate of Compliance ................................................60

Certificate of Service ......................................................61

APPENDIX:
Final Judgment of the Trial Court.......................................A
Findings of Fact and Conclusions of Law of the Trial Court...................B
Tex. Elec. Code § 1.015......................................................C
Tex. Elec. Code § 11.001 ....................................................D

# INDEX OF AUTHORITIES

## Cases

*Alvarez v. Espinoza*,
844 S.W.2d 238 (Tex. App.–San Antonio 1992, writ
dism'd w.o.j.) ............................................................................... 23-25,31,32

*Anderson Mill Mun. Util. Dist. v. Robbins*,
No. 03-04-00369-CV, 2005 WL 2170355 (Tex. App.–Austin Sept. 8, 2005,
no pet.) ..................................................................................................22

*Birnberg v. Sparks*,
410 S.W.2d 789 (Tex. App.–Corpus Christi 1966, writ ref'd n.r.e) .............34

*Burnside Air Conditioning and Heating, Inc. v. T.S. Young Corp.*,
113 S.W.3d 889 (Tex. App.–Dallas 2003, no pet.) ......................................28

*Croucher v. Croucher*,
660 S.W.2d 55 (Tex. 1983) ........................................................................50

*Flack v. First Nat'l Bank of Dalhart*,
226 S.W.2d 628 (Tex. 1950) ......................................................................49

*Gonzalez v. Villarreal*,
251 S.W.3d 763 (Tex. App.–Corpus Christi 2008, pet. dism'd)............*passim*

*Graham v. Villarreal*,
242 S.W.2d 258 (Tex. App.–San Antonio 1951, no writ)............................39

*Green v. Reyes*,
836 S.W.2d 203 (Tex. App.–Houston [14th Dist.] 1992, no writ)................21

*Guerra v. Garza*,
865 S.W.2d 573 (Tex. App.–Corpus Christi 1993, writ dism'd w.o.j.) ........21

*In re C.H.*,
89 S.W.3d 17 (Tex. 2002) ..........................................................................51

*In re Graham*,
251 S.W.3d 844 (Tex. App.–Austin 2008, no pet.)...................................24,33

*In re J.F.C.*,
96 S.W.3d 256 (Tex. 2002) .......................................................................51

*In re King's Estate*,
244 S.W.2d 660 (Tex. 1951) ......................................................................51

*Kiehne v. Jones*,
247 S.W.3d 259 (Tex. App.–El Paso 2007, pet. denied).............................32

*McDuffee v. Miller*,
327 S.W.3d 808 (Tex. App.–Beaumont 2010, no pet.).......................27,41,47

*Medrano v. Gleisner*,
769 S.W.2d 687 (Tex. App.–Corpus Christi 1989, no writ) .........................51

*Mills v. Bartlett*,
377 S.W.2d 636 (Tex. 1964) ............................................................24,25,32

*Office of the Atty. Gen. of Tex. v. Burton*,
369 S.W.3d 173 (Tex. 2012) ....................................................................22

*Owens Corning v. Carter*,
997 S.W.2d 650 (Tex. 1999) ....................................................................24

*Powell v. Stover*,
165 S.W.3d 322 (Tex. 2005) ....................................................................29

*Reese v. Ducan*,
80 S.W.3d 650 (Tex. App.–Dallas 2002, pet. denied) ........................19,21,50

*Slusher v. Streater*,
896 S.W.2d 239 (Tex. App.–Houston [1st Dist.] 1995, no writ) .................23

*Snyder v. Pitts*,
241 S.W.2d 136 (Tex. 1951) ....................................................................28

*State v. Fischer*,
769 S.W.2d 619 (Tex. App.–Corpus Christi 1989, no writ) ...............25,26,29

*Tovar v. Bd. of Trs. Of Somerset Indep. Sch. Dist.*,
994 S.W.2d 756 (Tex. App.–Corpus Christi 1999, pet. denied) ....32,33,37,47

*Vlandis v. Klein*,
414 U.S. 441 (1973)................................................................................35

*Walker v. Packer*,
827 S.W.2d 833 (Tex. 1992) ....................................................................28

*Woods v. Legg*,
363 S.W.3d 710 (Tex. App.–Houston [1st Dist.] 2011, no pet.).........27,35,37

**Statutes and Rules**

TEX. ELEC. CODE ANN. § 1.015 (West Suppl. 2013) ...........................................23,24

TEX. ELEC. CODE ANN. § 11.001 (West Suppl. 2013) ...............................................23

TEX. ELEC. CODE ANN. § 221.003 (West Suppl. 2013) ...........................................19,

TEX. ELEC. CODE ANN. § 221.009 (West Suppl. 2013) ................................................

TEX. ELEC. CODE ANN. § 221.011 (West Suppl. 2013) ...........................................20

TEX. ELEC. CODE ANN. § 221.012 (West Suppl. 2013) ...........................................20

TEX. R. CIV. P. 299 .....................................................................................................

## STATEMENT OF THE CASE

This an election contest arising out of the November 5, 2013 election for the District 5 seat on the City Commission of Weslaco, Hidalgo County, Texas (C.R. at 46-47). The case was tried to the bench from March 24-27, 2014 (C.R. at 240). The trial court signed a final judgment on July 25, 2014, voiding the contested election and ordering the City of Weslaco to conduct a new election (C.R. at 240-41). Rivera's Motion for New Trial was denied on September 25, 2014 (C.R. at 250). The trial court issued Findings of Fact and Conclusions of Law on October 27, 2014 (Suppl. at 22-32). Both sides have appealed the judgment, each asking this Court to reverse the trial court's decision and declare the winner of the contested election (C.R. at 251, 264).

# ISSUES PRESENTED FOR REVIEW

1. The trial court erred by failing to deduct the votes of Illiana Guerrero, Guadalupe Rivera, Jr., and Esteban Martinez from Guadalupe Rivera's final vote count, because Lopez proved as a matter of law that Illiana Guerrero and Lupe Rivera, Jr. reside outside District 5 and cast ballots for Rivera, and proved as a matter of law that Esteban Martinez voted for Rivera in the District 5 race.

2. The trial court erred by deducting the votes of Tomasa Cavazos, Jose Luis Martinez, Sr., and Jose Luis Martinez, Jr. from Leticia Lopez's final vote count, because there is insufficient evidence to support the finding that they voted for Leticia Lopez.

3. The trial court erred by failing to conclude that the votes of Delma Cadena, Alexia Dinah Chavez, Alyssa Domitria Chavez, Delma Ann Chavez, Diana Pena, Valerie Jadine Pena, Illiana Yvonne Rivera, Raul Rivera, Sr., and Raul Rivera, Jr. were illegal, because the evidence shows as a matter of law they do not reside in District 5.

4. The trial court erred by deducting four undervotes, rather than one, from the total number of illegal but undetermined votes cast in the election, because Lopez proved as a matter of law that only one undervote could possibly have been among the undetermined illegal votes.

## STATEMENT OF FACTS

On November 5, 2013, the City of Weslaco, Hidalgo County, Texas held a general election for, *inter alia*, the District 5 seat on the Weslaco City Commission (hereinafter "the contested election") (VI R.R. at 5). The candidates in the contested election were the incumbent, Appellant/Cross-Appellee Guadalupe "Lupe" Rivera, Sr. (hereinafter "Rivera"), and the challenger, Appellee/Cross-Appellant Leticia "Letty" Lopez (hereinafter "Lopez") (VI R.R. at 33-34). The final canvass of the contested election showed that Rivera received 487 votes and Lopez received 471 votes, creating a sixteen (16) vote margin of victory for Rivera (VI R.R. at 6).

On November 19, 2013, Lopez filed an election contest against Rivera, alleging the result of the contested election as shown by the final canvass was not the true outcome because illegal votes were counted (C.R. at 23-28). Specifically, Lopez alleged that numerous ballots were cast by voters who did not reside within District 5 (C.R. at 46-48) and that numerous ballots cast by mail failed to comply with the mandatory requirements of the Texas Election Code (C.R. at 49-52). Lopez also originally alleged that sixteen (16) mail ballots were improperly rejected by the Hidalgo County Early Voting Ballot Board (C.R. at 48-49), but she abandoned that claim at trial (IV R.R. at 243).

1

I.  Non-resident Voters

Lopez contested twenty-three (23) ballots cast in the election by voters she alleged did not reside within District 5.  Each of these voters was registered to vote using one of five addresses, all of which have a direct familial or social connection to Rivera.  In some cases, multiple voter registration applications were completed for the same address, on the same day, in the same handwriting.  To assist the Court's understanding of the facts, the contested (non-resident) voters from the five homes at issue are diagramed on the following page.  The votes at each address are discussed separately below.

## Votes Challenged Based on Residency of Voter

*\*Votes already declared illegal by the trial court are struck through*

---

**716 N. Padre**
*Rivera's Home*

~~Jose Heriberto Sandoval~~ (Lupe Rivera Jr.'s friend)
**Lupe Rivera, Jr.** (Rivera's son and campaign manager)
**Laura Rivera** (Rivera's daughter)

---

**316 W. Los Torritos**
*Home of Rivera's sister*
*Hortencia Cuellar*
~~Cassandra Alaniz~~ (Felipa's daughter)
~~Felipa Cuellar~~ (Hortencia's daughter)
**Illiana Guerrero** (Lupe Jr.'s wife)
**Illiana Rivera** (Irma's daughter)
~~Irma Rivera~~ (Raul's wife)
**Raul Rivera** (Rivera's brother)
~~Jacqueline Garcia~~ (Guerrero's sister)
~~Ricardo Garcia~~ (Jacqueline's husband)
**Raul Rivera, Jr.** (Irma's son)

---

**717 N. Padre**
*Home of Rivera's close friend*
*Margarito Martinez*

~~Noe Cavazos~~ (Margarito's son-in-law)
~~Tomasa Cavazos~~ (Margarito's daughter)

---

**608 N. Tio**
*Home of Margarito's daughter*
*Mary Lou Garcia*

~~Jose Luis Martinez~~ (Margarito's brother)
~~Jose Luis Martinez, Jr.~~ (Margarito's nephew)

---

**1518 E. 8th**
*Home of Eusebio Cadena*
**Delma Cadena** (Eusebio's daughter)
**Osmel Cadena** (Delma's husband)
**Alexia Chavez** (Delma's daughter)
**Alyssa Chavez** (Delma's daughter)
**Delma Chavez** (Delma's daughter)
**Diana Pena** (Eusebio's daughter)
**Valerie Jadine Pena** (Diana's daughter)

## A. 316 West Los Torritos Street

Nine contested ballots were cast by voters registered at 316 West Los Torritos Street (C.R. at 47). This two-bedroom, one-bathroom single-family residence is the home of Rivera's sister, Hortencia Cuellar (VI R.R. at 14). Ms. Cuellar testified by deposition. She stated that she sleeps in one of the bedrooms and that the other bedroom "is used for whenever [she] ha[s] any grandchildren to go to sleep there" (III R.R. at 92). She specifically identified only three grandchildren who ever stay at her house: Cassandra Alaniz, Corina Alaniz, and Jesse Alaniz (all of whom are the children of Ms. Cuellar's daughter, Felipa Cuellar) (III R.R. at 93). Ms. Cuellar confirmed that no one other than these three grandchildren and their mother regularly stays in her home (III R.R. at 94).

The trial court found by clear and convincing evidence that five of the nine contested voters do not reside at 316 West Los Torritos (Suppl. C.R. at 26, 28-29) and invalidated those votes (*Id*. at 29-30).[1] The court did not find by clear and convincing evidence that Raul Rivera, Sr., Raul Rivera, Jr., or Illiana Yvonne Rivera are not residents of 316 West Lost Torritos and therefore allowed those

---

[1] For three of those invalidated votes—those of Cassandra Alaniz, Felipa Cuellar, and Irma Rivera—the court found it could not determine for whom the votes were cast. (Suppl. at 28). The court thus added these three votes to the list of "undetermined illegal votes." If the number of undetermined illegal votes is greater than the margin of victory in the election, then a court trying an election contest cannot determine the true outcome and must void the election. *See discussion, infra* at 56-59.

votes to stand (*Id*. at 30). The court found that Illiana Guerrero does not reside at 316 West Los Torritos but did not invalidate her vote (*Id*. at 27).

### i. *Illiana Guerrero*

Illiana Guerrero cast a vote in the contested election claiming 316 West Los Torritos as her residence (III R.R. at 267). Ms. Guerrero is married to Guadalupe Rivera, Jr. (hereinafter "Lupe Jr.") (VI R.R. at 20), who is Appellant Rivera's son and was his campaign manager in the contested election (IV R.R. at 196). Ms. Guerrero is also the sister of contested voter Jacqueline Garcia, who is married to contested voter Ricardo Garcia (VI R.R. at 16). Voter registration applications— all bearing a signature date of September 18, 2013—were submitted for Ms. Guerrero, her sister, and her brother-in-law claiming residence at 316 West Los Torritos (Contestant's Ex. 40 at LL2086, LL2089, LL2093). The handwriting on each of these documents is strikingly similar. Ms. Guerrero testified that she completed her own application and that the handwriting on her application is her own (III R.R. at 250). The Garcias testified that they did not fill out the applications and that the handwriting is not their own (II R.R. at 210, 228-29). Ms. Guerrero voted in-person (III R.R. at 267), but applications for mail ballots were submitted in the Garcias' names (Contestant's Exs. 7A, 39 at LL1076). Votes were then cast in the election using those mail ballots (Contestant's Exs. 7B, 39 at

LL1077). The Garcias, however, did not complete those applications or cast those votes.

Both Jacqueline Garcia and her husband Ricardo testified in open court that neither had registered to vote, applied for a mail ballot, or cast a vote in the contested election (II R.R. at 208, 233). In fact, they could not have legally voted in the election because they live in Mercedes, Texas (VI R.R. at 16). The trial court credited their testimony, finding that the votes cast in the Garcias' names were illegal and that those votes had been cast for Rivera (Suppl. C.R. at 26; VI R.R. at 16-17). The court made no specific written finding regarding who cast those illegal votes, but found at the oral rendering of judgment that it was "clear that several frauds were committed when someone, my guess would be Illiana Guerrero Rivera, Lupe's wife and Jacqueline's sister filed a [change] of residency form and someone in the old Rivera homestead applied for ballot by mail and voted by mail" (VI R.R. at 16). The court intended its oral announcements to be a part of its findings of fact (Suppl. C.R. at 39).

Illiana Guerrero testified by deposition. She stated that she does not, in fact, reside at 316 West Los Torritos and that she only mistakenly registered to vote there (III R.R. at 251). While she testified that she and her husband Lupe Jr. reside

in a house located at 700 E. Eighth Street in Weslaco (III R.R. at 246-47),[2] she stated that she had intended to register at 716 N. Padre—the residence of Appellant Rivera—because she wanted to use the same address that her husband uses "on all his legal documents" (III R.R. at 251). She has never spent the night at that address (III R.R. at 251-52)—confirmed by Rivera's own testimony (IV R.R. at 201-02)—and she has no plans to move there unless she and her husband "needed to, and times got tough" (III R.R. at 252).

The trial court found that Illiana Guerrero does not reside at 316 West Los Torritos, but the court did not find that there was clear and convincing evidence that she resided outside of District 5 (Suppl. C.R. at 27). While the court found that Ms. Guerrero had no residential connection to 716 North Padre beyond her husband's claim to residence there, the court concluded that Ms. Guerrero's claim to residence "depends on the validity of her husband's claim residing at that address" (VI R.R. at 20). As the court did not invalidate Ms. Guerrero's vote, it made no finding regarding for whom she cast that vote (Suppl. C.R. at 39).

### ii. Other voters at 316 West Los Torritos Street

Raul Rivera, Sr., his wife Irma Rivera (III R.R. at 98), and their children Illiana Yvonne Rivera and Raul Rivera, Jr. (III R.R. at 97) cast votes in the election claiming 316 West Los Torritos as their residence. (VI R.R. 29-31). However, the

---

[2] Hidalgo County election official Brenda Renteria testified that 700 E. Eighth Street lies within District 2 of the Weslaco City Commission (III R.R. at 127).

7

homeowner—Hortencia Cuellar—testified that none of them ever spend the night at her house, and specifically stated that Irma, Raul, Sr., and Illiana Yvonne live together in a rental home elsewhere. (III R.R. at 98).[3] Appellant Rivera testified that the entire family (save for one child, who is married) resides on "Missouri Street." The trial court found by clear and convincing evidence that *Irma Rivera* resided at "South Missouri" street, not 316 West Los Torritos, and invalidated her vote (Suppl C.R. at 30). Despite their marriage, relying on voter registration history, the trial court did not find that Raul Rivera, Sr. resides outside District 5 with his wife (*Id*. at 29). Likewise, despite the testimony of Ms. Cuellar and appellant, relying exclusively on voter registration records (or the lack thereof), the trial court did not find that Illiana Yvonne and Raul Jr. reside outside District 5 with their parents. (*Id*. at 30-31). Notably, the court did find that Raul Jr.'s application to register at 316 "was filled out by the same person who filed the same date as his mother Irma" (whose vote was invalidated). (*Id*. at 31).

DPS records show an address for Raul and Irma Rivera at 105 ½ South Missouri, Weslaco, Texas (Contestant's Ex. 41).[4]

---

[3] Ms. Cuellar was responding to counsel's question at her deposition, in which counsel only referenced these three and did not ask about Raul Rivera, Jr.

[4] Hidalgo County election official Brenda Renteria testified that 105 ½ S. Missouri lies within District 3 of the Weslaco City Commission. (III R.R. at 127).

**B. 716 North Padre Avenue**

Three contested votes were cast by voters registered at 716 North Padre Avenue (C.R. at 47-48). This is the home of Rivera himself. (VI R.R. at 14).

The trial court found by clear and convincing evidence that one of the three contested voters—Jose Heriberto Sandoval—did not reside at 716 North Padre Avenue and deducted that vote from Rivera's final vote count (Suppl. at 26-27; VI R.R. at 18). The trial court did not find that Lupe Jr. or Laura Rivera do not reside there, and thus the court allowed those votes to stand (Suppl. at 27, 29).

### i. *Lupe Jr.*

Lupe Jr. cast a vote in the contested election claiming his parents' address at 716 North Padre Avenue as his residence (Contestant's Ex. 19 at LL178). Lupe Jr. is the thirty-three (33) year old (*see id.* (date of birth on combination form)) son of Appellant Rivera and was his campaign manager for the contested election (IV R.R. at 196). Lupe Jr. is also married to Illiana Guerrero. Lopez attempted to subpoena Lupe Jr. for both a deposition and trial (III R.R. at 77-78) (testimony of process server), but was unable to locate him, forcing her to rely on testimony obtained from his father and wife to establish his residency.

Lupe Jr.'s father, Appellant Rivera, testified at trial. He stated that his son rents his own house at 700 East 8th Street[5] with Illiana Guerrero (IV R.R. at 200-

---

[5] This address lies within District 2 of the Weslaco City Commission. *See supra*, note 2.

01). He stated that while his son "has always considered my home his home," he only stays there "off and on" (IV R.R. at 200).

Lupe Jr.'s wife, Illiana Guerrero, testified that she and Lupe Jr. have lived at 700 E. Eighth since November 2012 (III R.R. at 248) and that Lupe Jr. has typically spent the night there since that time (III R.R. at 249). With regards to the 716 North Padre address, Ms. Guerrero testified that Lupe Jr. "may have some [personal items] at his parents' home" but that his everyday items like clothes are kept at 700 East 8th (III R.R. at 252). While Lupe Jr. never sleeps at 716 North Padre (III R.R. at 252), his wife testified that when he leaves work night, "[h]e'll stop by his parents' home and then come *home*" (III R.R. at 253) (emphasis added).

Ms. Guerrero has not discussed with her husband's parents any plans for the couple to move into the house at 716 North Padre (III R.R. at 252). Instead, she and Lupe Jr. plan on buying their own home and only live at 700 East 8th "just in the meantime" (III R.R. at 248). However, during her cross-examination by Appellant Rivera's counsel, Ms. Guerrero followed counsel's lead and stated that 700 East 8th is not Lupe Jr.'s residence and that he actually does reside at 716 North Padre (III R.R. at 276-77).

The trial court did not find by clear and convincing evidence that Lupe Jr. is not a residents of District 5 (Suppl. C.R. at 27), because it "is not clear that he has

done anything other than *consider* 716 North Padre as his residence" (VI R.R. at 21) (emphasis added).  As the court did not invalidate Lupe Jr.'s vote, it made no finding regarding for whom he cast that vote (Suppl. C.R. at 39).

## C.  717 North Padre Avenue

Two contested votes were cast by voters registered at 717 North Padre Avenue (C.R. at 48).  This address is directly across the street from Rivera's residence and is the home of Rivera's close friend of fifty years, Margarito Martinez (III R.R. at 18).  Mr. Martinez testified in a deposition that was read into the record at trial, discussing the two contested voters registered at his home:  his daughter Tomasa Cavazos and her husband Noe Cavazos.

The trial court found by clear and convincing evidence that neither Tomasa Cavazos nor her husband Noe Cavazos reside in District 5 (Suppl. C.R. at 27).  The court further found that Tomasa cast a vote for Lopez but could not determine for whom Noe cast his vote (Suppl. C.R. at 27).  The court thus deducted one vote from Lopez's final vote count and added one vote to the list of undetermined illegal votes (Suppl. C.R. at 30).

### i.  Tomasa Cavazos

Tomasa Cavazos testified at trial in Rivera's case-in-chief, appearing without a subpoena (V R.R. at 60).  In fact, Ms. Cavazos testified that no one even asked her to appear, that she showed up at the courthouse to volunteer her

testimony, and that her only conversation with Rivera's counsel was a brief discussion right before taking the stand (V R.R. at 59-61). Ms. Cavazos proceeded to swear under oath that she resides at 717 North Padre (V R.R. at 37) and emphatically stated she sleeps there every night (V R.R. at 39).

Other testimony contradicted Ms. Cavazos's claim to residency at 717 North Padre. Michelle Carpenter—best friend of Ms. Cavazos's recently deceased daughter Crystal—testified that Ms. Cavazos and her husband live in a house located at 5617 FM 88 (II R.R. at 77).[6] Likewise, Jose Luis Martinez—Ms. Cavazos's uncle—testified that she and her husband live at the FM 88 address (II R.R. at 62).

The trial court did not believe that Ms. Cavazos's sworn testimony regarding her residency was truthful, instead crediting Michelle Carpenter's and Jose Luis Martinez's testimony and finding that Ms. Cavazos and her husband do not reside in District 5 (VI R.R. at 19; Suppl. C.R. at 27). The trial court did not, however, discredit Ms. Cavazos's statement that she voted for Lopez (V R.R. at 43), and the court deducted Ms. Cavazos's vote from Lopez's final vote count (VI R.R. at 20; Suppl. C.R. at 27).

---

[6] Hidalgo County election official Brenda Renteria testified that 5617 FM 88 lies outside any of the Weslaco City Commission districts (III R.R. at 128).

**D. 608 North Tio Street**

Two contested votes were cast by voters registered at 608 N. Tio Street (C.R. at 48). This is the home of Mary Lou Garcia, daughter of appellant Rivera's close friend Margarito Martinez. (III R.R. at 209:16-18). Jose Luis Martinez, Sr. and his son Jose Luis Martinez, Jr. testified that while they permanently reside in Mercedes, they stayed temporarily (for about a "month, month and a half") at 608 N. Tio during a domestic spat. (II R.R. at 23:20-24). They never intended to stay there permanently, as they "live out on the ranch" in Mercedes and "got to tend to our animals and keep on working." (*Id*. at 25-26). Nonetheless, Jose Jr., testified, he registered to vote at 608 N. Tio because "it's worth a try" (*Id*. at 28:10-17). The trial court recognized that Jose Sr. and Jose Jr. acknowledged to residing in Mercedes at all relevant times and invalidated their votes, but credited their testimony that they voted for Lopez, deducting two votes from Lopez (VI R.R. at 17-18).

**E. 1518 East 6th Street**

Seven contested votes were cast by voters registered at 1518 East 6th Street (C.R. at 46-47). In total, twenty-three (23) people were registered to vote at this five-bedroom (Contestant's Ex. 40 at LL2125-79; V R.R. at 106) home of Eusebio and Domitila Cadena (III R.R. at 110), and the challenged voters are their extended family members. The trial court did not find that any of the contested voters

resided outside District 5.  To avoid unnecessary repetition, factual detailed is referenced only in the argument section, *infra* at 45-48.

## II.  Mail Ballot Voters

### A.  Esteban Martinez

Mr. Martinez voted by mail in the contested election (VI R.R. at 11-12).  Mr. Martinez had never voted by mail before, and he is able to read and write.  (II R.R. at 198-99).  Rivera appeared at Mr. Martinez's home and completed the actual ballot for him. (*Id.* at 200).  All Mr. Martinez did was sign the carrier envelope. (*Id.* at 199).  Mr. Martinez testified that he instructed Rivera to cast a vote for himself, (*id.* at 201-02), a fact the court itself noted at trial (*id.* at 204).

On cross-examination, Rivera's counsel did not challenge Mr. Martinez's testimony that he had voted for Rivera.  (*Id.* at 205).  Mr. Martinez was only asked to verify that the signature on the carrier envelope containing his ballot was his own. (*Id.*).  At no other point during trial did Rivera present any evidence contradicting Mr. Martinez's testimony that Rivera completed his ballot under the instruction to cast a vote for Rivera. The trial court found Mr. Martinez's ballot illegal for Rivera's failure to disclose his signature and name and address on the carrier envelope, but did not enter a finding that Martinez's ballot contained a vote for Rivera. (Suppl. C.R. at 25; VI R.R. at 11-12).

III. Undervote Analysis

Overall, the trial court determined that there were eleven ballots cast in the November 2013 elections that were illegal (seven cast by mail, and four by nonresidents), but for which the evidence did not establish whether that ballot contained a vote for either Lopez or Rivera (Suppl. C.R. at 31). The November 2013 ballot contained multiple city elections and state constitutional amendment propositions. Based on the canvass report, the court found that of all the ballots cast in the November 2013 election by residents of District 5, four of those ballots did not contain a vote for either Lopez or Rivera (referred to as 'undervotes') (Suppl. C.R. at 31). To account for the possibility that any of the eleven (11) undetermined illegal votes were also undervotes as to the District 5 race, the court deducted four votes from the list of undetermined illegal votes, leaving an adjusted total of seven illegal ballots that by mathematical necessity contained a vote in the District 5 race, but undetermined as to which candidate (Suppl. C.R. at 31; VI R.R. at 33-34).

IV. Judgment of the Trial Court

The trial court's findings resulted in an adjusted final vote count of 468 votes for Lopez and 471 votes for Rivera, creating an adjusted margin of victory for Rivera of three votes (Suppl. C.R. at 31). Because the adjusted total of seven undetermined illegal votes was greater than Rivera's three-vote adjusted margin of

15

victory, the trial court concluded that it was unable to declare a winner in the District 5 race (Suppl. C.R. at 32). The court entered a final judgment voiding the contested election and ordering the City of Weslaco to hold a new election for the District 5 seat on the Weslaco City Commission (C.R. at 240-41). This appeal (and cross-appeal) ensued.

## SUMMARY OF THE ARGUMENT

The trial court has already eliminated thirty illegal ballots. Two were the result of "several frauds…committed when someone, my guess would be Illiana Guerrero Rivera, Lupe [Rivera, Jr.]'s wife…filed a [change] of residency form and someone in the old Rivera homestead applied for ballot by mail and voted by mail" on behalf of Jacqueline and Ricardo Garcia (VI R.R. at 16:20-25). Lopez proved—with evidence that was uncontradicted but inappropriately marginalized by the trial court—that at least eleven more ballots were illegally cast by persons not residing in District 5.

The trial court invalidated five ballots cast by individuals registered at appellant Lupe Rivera's sister's home (316 W. Los Torritos), including Irma Rivera, finding that they resided outside the District. However, Lopez additionally proved that Irma's husband Raul Rivera, Sr., and their two children Raul Jr. and Illiana Yvonne, reside with Irma outside the district. The evidence conclusively establishes that these individuals not only lack bodily presence and intent for residence at 316 W. Los Torritos, but that they have established same at Missouri Street. Likewise, the evidence is conclusive that Illiana Guerrero and Lupe Rivera, Jr., not only lack bodily presence and intent to reside at 716 N. Padre, but have established the same at the apartment they have shared outside the district for a year prior to the election. The same is true for six individuals who claimed to

17

reside—along with twenty three others—at a single family home at 1518 E. Sixth Street. With respect to Illiana Guerrerro, the trial court also erred in basing her residency on that of her husband, implicating de novo review as to her residency.

With respect to all residency challenges, the court appears to have accorded conclusive weight to one single factor—the voter's registration history. This factor is circular and cannot trump facts establishing that the residency elements—bodily presence and intent—are not satisfied.

The trial court also erred in crediting the testimony of illegal voters Tomasa Cavazos, Jose Luis Martinez, Sr. and Jose Luis Martinez, Jr., to the effect that they voted for Lopez instead of Rivera. These individuals were all part of a family supporting Rivera, and by the time they testified, it was clear that their residency claims could not withstand scrutiny. The self-interested testimony of such a voter is inherently suspicious and the trial court erred in deducting their votes from Lopez.

Lastly, the trial court erred in failing to find—based on the uncontradicted evidence—that Esteban Martinez's invalidated ballot contained a vote for Rivera.

**ARGUMENT**

## I.     Standard of Review of Election Contests

### A.     Scope of Election Contest Inquiry

The "tribunal hearing an election contest shall attempt to ascertain whether the outcome of the contested election, as shown by the final canvass, is not the true outcome because: (1) illegal votes were counted; or (2) an election officer or other person officially involved in the administration of the election: (A) prevented eligible voters from voting; (B) failed to count legal votes; or (C) engaged in other fraud or illegal conduct or made a mistake."  Tex. Elec. Code § 221.003(a).  In an election contest, "'illegal vote' means a vote that is not legally countable."  *Id.* at § 221.003(b).

The District 5 election between Lupe Rivera and Leticia Lopez was on the ballot along with various constitutional amendments and a race for Weslaco mayor.  (Contestant's Ex. 21).  In such circumstances, i.e., where the contested election was on a ballot involving other races,

> The contestant must next show the illegal votes were cast in the race being contested. *Miller v. Hill*, 698 S.W.2d 372, 375 (Tex. App.– Houston [14th Dist.] 1985, writ dism'd w.o.j., 714 S.W.2d 313 (Tex. 1986) (per curiam)]; *Medrano v. Gleinser,* 769 S.W.2d 687, 688 (Tex.App.–Corpus Christi 1989, no writ).

*Reese v. Duncan*, 80 S.W.3d 650, 656 (Tex. App.–Dallas 2002, pet. denied) (some internal citations omitted).  Here, the requirement that Contestant show the illegal

votes were cast "in the race being contested" means she must show illegal votes were cast in the District 5 race. "If the tribunal hearing an election contest can ascertain the candidate…for which an illegal vote was cast, the tribunal shall subtract the vote from the official total for the candidate[.]" Tex. Elec. Code § 221.011(a). "If the tribunal finds that illegal votes were cast but cannot ascertain how the voters voted, the tribunal shall consider those votes in making its judgment." *Id.* at § 221.011(b). "If the tribunal hearing an election contest can ascertain the true outcome of the election, the tribunal shall declare the outcome," *id.*, but "the tribunal shall declare the election void if it cannot ascertain the true outcome of the election." *Id.* at § 221.012(a), (b).

Therefore, if Contestant shows that an illegal vote was cast, and that the vote was cast for a particular candidate, this court "shall" subtract the vote from that candidate's total. *Id.* at § 221.011(a). However, Contestant is not *required* to show the *candidate* for whom an illegal vote was cast, because "[t]he election code…recognizes that [such] may be impracticable or even impossible[.]" *Gonzales v. Villareal*, 251 S.W.3d 763, 782 (Tex. App.–Corpus Christi 2008, pet. dism'd). "Rather," the Thirteenth Court of Appeals has explained:

> the code provides that 'if the tribunal finds that illegal votes were cast but cannot ascertain how the voters voted, the tribunal shall consider those votes in making its judgment.' *Id.* § 221.011(b) (Vernon 2003). Although section 221.011 does not dictate exactly *how* those illegal votes should be considered, section 221.009 provides the answer: '[i]f the number of illegal votes is equal to or greater than the number of

20

> votes necessary to change the outcome of an election, the tribunal may declare the election void without attempting to determine how individual voters voted.' *Id.* § 221.009(b) (Vernon 2003). In other words, if a trial court determines that illegal votes were cast and that the number of illegal votes equals or is greater than the margin of victory, the trial court can then declare the election void without ever inquiring as to the candidate for whom those illegal votes were cast.

*Gonzalez*, 251 S.W.3d at 782.

The trial court may infer that illegal ballots lacking evidence of a vote in the contested race actually contained votes in the contested race by compensating for the number of undervotes that could potentially be among those ballots. *Reese*, 80 S.W.3d at 664.[7]

## B.     Standard of Review on Appeal

The standard of review on appeal from a judgment in an election contest is whether the trial court abused its discretion. *Gonzalez*, 251 S.W.3d at 774-75; *Guerra v. Garza*, 865 S.W.2d 573, 576 (Tex. App.–Corpus Christi 1993, writ dism'd w.o.j.). A trial court commits an abuse of discretion when either (1) the court did not have sufficient information upon which to exercise its discretion or (2) the court erred in its application of discretion such that the court's decision is so arbitrary and unreasonable that it rises to the level of a clear and prejudicial error of law. *See Gonzalez*, 251 S.W.3d at 774-75 n.16.

---

[7] *See also Green v. Reyes*, 836 S.W.2d 203 (Tex. App.–Houston [14th Dist.] 1992, no writ) (using statistical analysis to determine that contestant had proven enough illegal votes to void election).

**II. The Trial Court Abused Its Discretion by Failing to Invalidate Additional Votes, Because Lopez Proved as a Matter of Law That Additional Votes Were Cast by Persons Not Residing In District 5.**

The uncontradicted evidence presented in this case establishes as a matter of law that, in addition to the thirty uncountable votes already invalidated, several additional voters cast illegal votes in the contested race. The trial court's failure to invalidate these additional votes was error in its application of discretion that was so arbitrary and unreasonable that it rises to the level of a clear and prejudicial error of law.[8]

**A. Legal sufficiency review of issues upon which Lopez had the burden of proof at trial.**

Lopez had the burden at trial to prove by clear and convincing evidence that illegal votes affected the outcome of the contested race. In reviewing the legal sufficiency of an adverse finding on an issue for which the appellant had the burden of proof at trial, the record is reviewed as follows:

> In a legal sufficiency review, a court should look at all the evidence in the light most favorable to the finding to determine whether a reasonable trier of fact could have formed a firm belief or conviction that its finding was true. To give appropriate deference to the factfinder's conclusions and the role of a court conducting a legal sufficiency review, looking at the evidence in the light most favorable to the judgment means that a reviewing court must assume that the

---

[8] Lopez preserved error for this appeal through the multiple rounds of trial and post-judgment briefing that presented the trial court with all of the legal contentions she makes in her appeal (C.R. at 83-239). *See Anderson Mill Mun. Util. Dist. v. Robbins*, No. 03-04-00369-CV, 2005 WL 2170355 (Tex. App.–Austin Sept. 8, 2005, no pet.); *see also Office of Atty. Gen. of Tex. v. Burton*, 369 S.W.3d 173 (Tex. 2012).

factfinder resolved disputed facts in favor of its finding if a reasonable factfinder could do so. A corollary to this requirement is that a court should disregard all evidence that a reasonable factfinder could have disbelieved or found to have been incredible. This does not mean that a court must disregard *all* evidence that does not support the finding. Disregarding undisputed facts that do not support the finding could skew the analysis of whether there is clear and convincing evidence.

*Gonzalez*, 251 S.W.3d at 775-76 (quoting *In re J.F.C.*, 96 S.W.3d 256, 265-66 (Tex. 2002)).  *See Alvarez v. Espinoza*, 844 S.W.2d 238, 248 (Tex. App.–San Antonio 1992, writ dism'd w.o.j.) (reversing adverse finding against an election contestant who proved votes were illegal as a matter of law); *but see Slusher v. Streater*, 896 S.W.2d 239, 243 (Tex. App.–Houston [1st Dist.] 1995, no writ) (reviewing an adverse finding against an election contestant as if the trial court had made a positive finding that the voters "voted legally" instead of finding that the contestant had not met her burden to prove the votes were illegal).

### B.    Residency under the Election Code

"To be eligible to vote in an election, a person 'must…be a resident of the territory covered by the election.'"  *Gonzalez*, 251 S.W.3d at 776 (citing Tex. Elec. Code § 11.001).  "Residence" is defined in the Code as follows:

(a) **In this code, "residence" means domicile, that is, one's <u>home</u> and <u>fixed place of habitation</u> to which one intends to return after any temporary absence.**

(b) Residence shall be determined in accordance with the common-law rules, as enunciated by the courts of this state, except as otherwise provided by this code.

(c) A person does not lose the person's residence by leaving the person's home to go to another place for *temporary* purposes only.

(d) A person does not acquire a residence in a place to which the person has come for *temporary* purposes only and without the intention of making that place the person's home.

Tex. Elec. Code § 1.015 (emphasis added).

To establish residency, both elements—*bodily presence* and *intent*—must be met. *Mills v. Bartlett,* 377 S.W.2d 636, 637 (Tex. 1964). "Neither bodily presence alone nor intention alone will suffice to create the residence, but when the two coincide at that moment the residence is fixed and determined." *Id.* "[U]nder the statute the election officials are to <u>focus on the voter's 'home and fixed place of habitation</u>.' Intention and presence are important evidentiary factors, and a temporary move from one place to another will neither create a new residence nor lose an old one." *Alvarez v. Espinoza*, 844 S.W.2d 238, 247 (Tex. App.–San Antonio 1992, writ dism'd w.o.j.) (emphasis added). Even where intent is sufficient, residency is not established if the voter's "presence in the district is, as a matter of law, too attenuated." *Id.* at 248; *see also Owens Corning v. Carter*, 997 S.W.2d 560, 571 (Tex. 1999) ("[A]lthough intent is *necessary* to establish a permanent residence, it alone is not *sufficient* to establish a permanent residence." (emphasis in original)). "In assessing presence, the cases have considered such conduct as where the voter sleeps and keeps clothes and furniture, and the length of time spent in the alleged residence." *Id.*; *see also In re Graham*, 251 S.W.3d 844,

850-51 (Tex. App.–Austin 2008, no pet.) (for purposes of "domicile" as related to jurisdiction, evidence that individual "slept, gardened, entertained guests, stored her personal possessions, and generally conducted day-to-day activities in Travis County conclusively establishes residence in fact and intent to make the residence her home.").

While a person need not continue to be present for any specific length of time to establish permanent residency, that person must take overt, willful action to establish the location as her home and fixed place of habitation. *See Mills*, 377 S.W.2d at 637; *Alvarez*, 844 S.W.2d at 247; *State v. Fischer*, 769 S.W.2d 619, 624 (Tex. App.–Corpus Christi 1989, no writ).

In *Alvarez v. Espinoza*, the San Antonio Court of Appeals reviewed the sufficiency of the trial court's determination that nine voters were residents of Precinct Three of the Frio County Commissioners Court. 844 S.W.2d at 247. In overruling the trial court's finding, the court of appeals held that six of these voters were not residents as a matter of law. *Id.* at 248. Robert Nieto had lived with his wife in San Marcos, Hays County for several years while she attended school there. *Id.* While he stated he and his wife would "make more definite plans when she graduates," he still claimed that Frio County was his permanent home. *Id.* Voters Rolando Segovia and his wife Monica Mendez had lived outside precinct three for several years and moved back one month after the election. *Id.* They

voted in the election, claiming to have been residents of Rolando's mother's home within the district during their absence. *Id.*

In holding that each of these voters were not entitled to vote in the election, the court explained, "It cannot be seriously argued that precinct three is their 'home and fixed place of habitation' under § 1.015. Although they may satisfy the intent element of the test for residence, their presence in the district is, as a matter of law, too attenuated." *Id.*

In *State v. Fischer*, this Court held that Steven Fischer, a candidate for public office in Willacy County, was ineligible to run because he did not reside in the county on or before the deadline to file for office. 769 S.W.2d at 620, 624. Fischer had taken some action to establish his presence in the county, including:

- applying for a job at the Willacy County Attorney's Office;
- spending four days at a hotel in Willacy County;
- looking for homes for sale in Raymondville;
- applying to teach school at Pan American University in Hidalgo County;
- telling people he was going to live and work in Willacy County; and
- discussing with the Willacy County Attorney a job available on September 21, 1987.

This Court held that these activities alone did not establish his presence in Willacy County. *Id.* "Something more is needed. [Fischer] may have intended to reside in Willacy County at some time or another, but one's residence cannot be determined solely by intention." *Id.* Like the candidate in *Mills*, Fischer's

presence in Willacy County was established only when he took the overt action of accepting the job with the county attorney on September 21, 1987. *Id.*

Moreover, "[w]hen a person's statements regarding residence are inconsistent with other evidence showing actual residence, such statements 'are of slight weight' and cannot establish residence in fact." *Woods v. Legg*, 363 S.W.3d 710, 715 (Tex. App.–Houston [1st Dist.] 2011, no pet.) (citing *In re Graham*, 251 S.W.3d at 850)); *accord McDuffee v. Miller*, 327 S.W.3d 808, 820 (Tex. App.–Beaumont 2010, no pet.) ("[D]ocuments in evidence allowed the trial court to infer that the intent of each voter casting a challenged vote was to stay at the Residence Inn temporarily, and not to establish residence there despite each voter's testimony to the contrary.").

C. **Lopez proved as a matter of law that Lupe Jr. and Illiana Guerrero were not eligible to vote because they do not reside in District 5, and that they cast votes for Rivera in the election.**

Lupe Jr.'s and his wife Illiana Guerrero's votes were illegal because they are not residents of District 5. Even considering all the evidence in the light most favorable to the lower court's finding, a "reasonable trier of fact could" not have "formed a firm belief or conviction that its finding was true" because "undisputed facts"[9] established as a matter of law that Lupe Rivera, Jr. and Illiana Guerrero

---

[9] *See Gonzalez*, 251 S.W.3d at 775-76.

have a "home and fixed place of habitation" outside District 5 and not at 716 North Padre. [10]

        *1. Undisputed facts establish that Lupe Rivera, Jr. and Illiana Guerrero have bodily presence in a residence outside District Five.*

As a preliminary matter, it is important to note that the trial court expressly stated that, considering Illiana's residency on its own merits, "there would be no doubt that she would not have a residence anywhere in District 5." (VI R.R. at 20). However, the trial court believed—erroneously—that ""[Illiana's] claims to reside at [the] North Padre address depends on the validity of her husband's claim residing [sic] at that address," because "the only connection she has with the North Padre address is that her father-in-law owns it and her husband claims it as his residence." *Id*.[11] Thus, the trial court accorded conclusive weight—even as to Illiana Guerrero—to the residency claims of Lupe Jr.

---

[10] The trial court made some specific findings regarding the constituent elements of residency during the oral rendering of judgment (VI R.R. at 20-21) but not in its written findings (Suppl. C.R. at 27). A reviewing court, however, will imply all necessary findings to support the judgment if they are supported by the record. *See Gonzalez*, 251 S.W.3d at 775; *Burnside Air Conditioning and Heating, Inc. v. T.S. Young Corp.*, 113 S.W.3d 889, 892-93 (Tex. App.–Dallas 2003, no pet.).

[11] The trial court seems to have based much of its determination regarding Illiana Guerrero on the proposition that a wife's residence depends on the residence of her husband (VI R.R. at 20). This is not the law. A line of cases did once hold that the residence of the *husband* depends on the residence of the *wife*, but those cases were based on an election statute no longer in effect. *See generally Snyder v. Pitts*, 241 S.W.2d 136, 413 (Tex. 1951). To the extent that the trial court based its conclusions on this test, those conclusions should be reviewed *de novo*. *See Walker v. Packer*, 827 S.W.2d 833, 840 (Tex. 1992) ("A trial court has no 'discretion' in determining what the law is or applying the law to the facts. Thus, a clear failure by the trial court to analyze or apply the law correctly will constitute an abuse of discretion.").

The only evidence Rivera offered to show his son's presence at 716 N. Padre was the testimony of Rivera that Lupe Jr. stays there "off and on" (IV R.R. at 200). This does not amount to even a scintilla of evidence to support the conclusion that he has established bodily presence at 716 N. Padre, because it does not demonstrate willful, overt action to make that place his home and *fixed* place of habitation. Any visitor can stay at a place "off and on" without establishing it as his home. Like Fischer, Lupe Jr.'s actions are not enough; "[s]omething more is needed" to demonstrate his presence for residency. *See Fischer*, 769 S.W.2d at 624.

Here, it is undisputed that Lupe Jr. and his wife Illiana Guerrero have lived together continuously since November 2012 in a house at 700 E. Eighth Street (III R.R. at 246-47; IV R.R. at 200-01).[12] At the beginning of her testimony, in response to the straightforward question, "[W]here do you live?," Ms. Guerrero responded "I *reside* at 700 East 8th Street in Weslaco." (III R.R. at 246) (emphasis added). This followed:

> **Q: And how long have you lived there, about, approximately?**
> A: About two years, year and a half.
> **Q: And is that an apartment or --**
> A: It's a home.
> **Q: Okay. Do you own the home?**
> A: No, we rent.

---

[12] When asked where she and her husband live, Ms. Guerrero answered 700 East 8th (III R.R. at 246). The word 'live' strongly connotes physical presence. *Powell v. Stover*, 165 S.W.3d 322, 326 (Tex. 2005).

**Q: Who is we?**
A: Lupe and I, Lupe Rivera and I.
**Q: Lupe Rivera, Jr.?**
A: Yes.

(*Id*. at 246-47). Ms. Guerrero further testified:

**Q: So as far as you're concerned, you all live there together permanently, I mean for the foreseeable future?**
A: No. I mean, we plan on buying on a home. This is just in the meantime.
**Q: Okay. Have you all looked for homes, or do you know where you're gonna look?**
A: No, not really.
…
**Q: I believe in November 2012 is when you said you all moved to the East 8th Street address?**
A: Yes.
**Q: And has [Lupe Rivera, Jr.] stayed there overnight for –**
A: Yes.
**Q: --you know, typically since then?**
A: Yes.

(*Id*. at 248-49). As for herself, Ms. Guerrero confirmed that she has *not slept a single night* at the 716 N. Padre home. (*Id*. at 251-52; *see also* IV R.R. at 201-02).[13]

**Q: Okay. Does Lupe Rivera, Jr. ever sleep there [at 716 N. Padre]?**
A: No.
**Q: And is it safe to say if he's lived with you at 700 East 8th Street since November 2012, does he keep all of his clothes and his personal items at that address?**
A: He may have *some things* at his *parents' home*, I mean. I have things at my parents' home, so—
**Q: Right, but the stuff that he, you know, uses every day, his clothes are in his closet at 700 East 8th; is that correct?**

---

[13] Ms. Guerrero does not even *visit* 716 N. Padre often (III R.R. at 254).

A: Yes.

**Q: Okay. When he comes home from work, does he come home to 700 East 8th Street?**

A: He'll stop by his parents' home *and then come home*.

(*Id.* at 252-53 (italics added)). Appellant Rivera confirmed at trial that his son "rents his own apartment" with Illiana at 700 E. Eighth (IV R.R. at 200:22, 201:12-24). Illiana's sister Jacqueline confirmed that Illiana and Lupe Jr. live together at 700 E. Eighth St. (II R.R. at 215:2-24; IV R.R. at 201:12-24).

Therefore, the evidence as to the bodily presence element of residency is overwhelming and *uncontradicted*: Lupe Jr.'s and Illiana Guerrero's "home and fixed place of habitation" is in District 2, not District 5. Illiana herself has never slept at 716 North Padre. Thirty-three year-old Lupe Jr. sleeps at 700 E. Eighth with his wife, and not at 716 N. Padre with his parents. Lupe Jr.'s clothes and other personal belongings are at his home with his wife.

Like the voters in *Alvarez*, their presence in District 5 is too attenuated. 844 S.W.2d at 248. Just as Robert Nieto could not claim presence in Frio County when he lived with his wife in Hays County and had no definite plans to move, *id.*, Lupe Jr. and Illiana Guerrero cannot claim presence in District 5 when they live in District 2 and have no definite plan to move. Just as Rolando Segovia could not claim presence at his mother's home when he in fact lived with his wife elsewhere, *id.*, Lupe Jr. cannot claim presence at his parents' house when he and Illiana Guerrero live together elsewhere. It cannot seriously be argued that District 5 is

31

their "home and fixed place of habitation." *See id.* Instead, the uncontradicted evidence proves that Illiana Guerrero and Lupe Jr. have established bodily presence in District 2. Because they failed to meet one of the necessary elements of residency, their votes in the contested election were illegal.

2. *Undisputed facts establish that Lupe Jr. and Illiana Guerrero have a present intention to reside at 700 E. Eighth, not 716 N. Padre.*

Residency requires a present intent to make a place one's home and fixed place of habitation and requires demonstrable evidence of that intent beyond mere assertions of residence. Neither Lupe Jr. nor his wife Illiana Guerrero have demonstrated present intent to make 716 N. Padre Avenue their home and fixed place of habitation.

Residence is not established until a person demonstrates a present intent to make that place her home and fixed place of habitation, and it is lost when a person leaves a permanent home and moves to another place with no present intent to return to the former home. *See Mills*, 377 S.W.2d at 637; *Kiehne v. Jones*, 247 S.W.3d 259, 264 (Tex. App.–El Paso 2007, pet. denied) (explaining that residence "depends in great extent on the *present* intent of the individual" (emphasis added)); *Tovar v. Bd. of Trs. of Somerset Indep. Sch. Dist.*, 994 S.W.2d 756, 762 (Tex. App.–Corpus Christi 1999, pet. denied) (explaining loss of residence if no present intent to return).

32

A person loses residence at a place by moving to a new location without presently intending to return to that place. *Tovar*, 994 S.W.2d at 762. Tovar was a school board trustee, but when he moved outside of his district, the board sought to oust him for failing to maintain residence in the district he represented. *Id*. at 758. Tovar admitted that he had moved to an address outside of his district, but maintained that this address was only temporary and that he had always intended to return to his district. *Id.* at 762. The substance of his testimony, however, only demonstrated the reasons he left his district; it did not demonstrate evidence supporting his claim of his intent to return. *Id.*

In holding that he had lost his residence in his district, this Court explained that "where a county officer moves away from the territory the officer represents and there is no evidence that the county officer intends to return to that territory, the county officer vacates his or her office." *Id.* at 763. As residence for purposes of running for office is legally equivalent to residence for purposes of voting, this holding applies to voters who move away and offer no evidence of their intent to return. *See* Tex. Elec. Code § 1.015 (defining residence for all purposes under the Election Code).

### a. Application to Illiana Guerrero

The fact that Guerrero presently makes her home at 700 E. Eighth St. is strongly indicative of her present *intent* to reside there. *In re Graham*, 251 S.W.3d

at 850-51 (holding evidence that person slept and conducted day-to-day activities in Travis County "conclusively establishes residence in fact and intent to make the residence her home"). There was no evidence offered to support the trial court's implied finding that Illiana Guerrero does not have the present intent to reside outside District 5. The only evidence offered to contradict Ms. Guerrero's definitive statements regarding her intent to reside at 700 E. Eighth was a series of responses to leading questions by Appellant Rivera's counsel that did not actually address her present intent to make 716 N. Padre her home and fixed place of habitation (nor did they address *any* question regarding her presence there) (III R.R. at 276-77).

Instead, counsel only led Ms. Guerrero to agree with his own legal conclusions, such as the conclusion that her "residence is . . . the residence of [her] husband, right?" (III R.R. at 277). Legal conclusions, however, are not evidence unless they are sustained by facts. *See Birnberg v. Sparks*, 410 S.W.2d 789, 794 (Tex. App.–Corpus Christi 1966, writ ref'd n.r.e.) (holding that legal terms used in an affidavit were "legal conclusions, and although permissible under the statute as pleadings, they are required to be sustained by evidence of facts"). A bare assertion of one's residency cannot alone be factual evidence of intent, because such a statement is implicit in the act of submitting a voter registration

34

application.[14]   Moreover, where "a person's statements regarding residence are inconsistent with other evidence showing actual residence, such statements 'are of slight weight' and cannot establish residence in fact." *Woods*, 363 S.W.3d at 715. As Rivera introduced no factual evidence to support the legal conclusion that Ms. Guerrero intends to reside at 716 N. Padre, there was no evidence supporting the trial court's finding that she does not have the present intent to reside outside District 5.

The entirety of the record clearly supports, as a matter of law, that Illiana Guerrero has the present intent to make 700 E. Eighth St. her home and fixed place of habitation. When asked if her husband returns to that address after work each day, she explained that he will "stop by his parents' home and then come *home*" (III R.R. at 253) (emphasis added). While she did not actually ever submit a voter registration application at 716 N. Padre, she claimed to have intended to register there; however, she did not intend to register there because she thinks of 716 N. Padre has her home, but because she wanted to use the same address that her husband uses on "legal documents" (III R.R. at 251).

---

[14] Without more, the test outlined in *Mills* would be rendered meaningless, as the mere filing of a voter registration application would create an unconstitutional irrebuttable presumption of intent to make a place one's home and fixed place of habitation. *See Vlandis v. Kline*, 414 U.S. 441, 452 (1973) ("[P]ermanent irrebuttable presumptions have long been disfavored under the Due Process Clause of the Fifth and Fourteenth Amendments.").

To the extent that Ms. Guerrero has any present intent to make any place other than 700 E. Eighth St. her home and fixed place of habitation, it is not 716 N. Padre. When Guerrero testified that the 700 E. Eighth residence was temporary and that they "plan on buying a home," Counsel for Lopez asked Guerrero if she knew where they were going to look for a home to buy. (III R.R. at 249). Guerrero had a perfect opportunity to state that they intended to move into 716 N. Padre, if that was in fact the case. Instead, Guerrero stated she did "not really" know where they hoped to buy. (*Id.*) Moreover, she has not discussed with her husband's parents the possibility of moving to 716 N. Padre (III R.R. at 252), and would only consider doing so on the contingency that she and her husband "needed to, and times got tough" (III R.R. at 252). The entirety of the record thus supports, as a matter of law, the contrary proposition that Ms. Guerrero presently intends to make 700 E. Eighth her home and fixed place of habitation.

### b. Application to Lupe Rivera, Jr.

As with his common-law wife Illiana, the fact that Lupe Jr. actually makes his home at 700 E. Eighth St. is strongly indicative of his intent to reside there. *In re Graham*, 251 S.W.3d at 850-51. There was no evidence offered to support the trial court's implied finding that Lupe Jr. does not have the present intent to reside outside District 5. Aside from the legal conclusions Illiana Guerrero repeated during questioning by Rivera's counsel, the only testimony even touching on Lupe

36

Jr.'s intent was the statement made by Rivera—an interested party whose job depended on his answer—that his son has "always considered my home his home" (IV R.R. at 200). As an initial matter, self-serving statements regarding residency that are inconsistent with other evidence are "of slight weight and cannot establish residence in fact." *Woods*, 363 S.W.2d at 715. Even aside from the slight weight to be accorded such a statement, like the trustee in *Tovar*, Appellant's statement does not demonstrate that when Lupe Jr. moved out of his parents' house at 716 N. Padre, he had the *present* intent to move back in after a temporary absence or that such intent was present at the time of this election. 994 S.W.2d at 762. Stripped of the self-serving and conclusory testimony of Illiana and Rivera, there was thus *no* evidence to support the trial court's finding.

The entirety of the record clearly supports, as a matter of law, the contrary proposition the Lupe Jr. intends to make 700 E. Eighth his home and fixed place of habitation. His wife stated that they plan on buying their own home when they are able, but they presently intend to live at 700 E. Eighth "in the meantime" (III R.R. at 249). They have not yet even begun to look for a home to buy (III R.R. at 249). In the entirety of her direct testimony, Ms. Guerrero continuously refers to 700 East 8th as their home and 716 N. Padre only as her husband's parents' home (*See e.g.*, III R.R. at 253). The entirety of the record thus supports, as a matter of law,

the contrary proposition that Lupe Jr. presently intends to make 700 E. Eighth Street his home and fixed place of habitation.

### 3. *Lupe Jr. and Illiana Guerrero cast their votes for Rivera.*

Because the trial court did not conclude that the votes of Lupe Jr. and Illiana Guerrero were cast illegally, it made no finding regarding for whom those votes were cast. Because she proved as a matter of law that Lupe Jr. and Illiana Guerrero cast illegal votes, Lopez requested the trial court make additional findings that they voted for Rivera (Suppl. C.R. at 34-35), but the court refused (Suppl. C.R. at 39). A trial court's refusal to make a requested finding is reviewable on appeal. Tex. R. Civ. P. 299.

The record contains no evidence that would support a conclusion that Lupe Jr. and Illiana Guerrero either cast their illegal votes for Lopez or left their ballots blank as to the District 5 race. The entirety of the record clearly supports the contrary proposition that Lupe Jr. and Illiana Guerrero cast their ballots for Rivera. Lupe Jr. was Rivera's campaign manager in the very election at issue here (IV R.R. at 196, and was present when illegal mail ballots—which the trial court found contained votes for Rivera—were completed (II R.R. 136 (testimony of mail ballot voter Marlen Martinez)). Lupe Jr. was actively supporting appellant Rivera during the litigation of this case, having visited the home of Maria Berrones in an attempt

to persuade her to ignore her deposition subpoena.[15] No reasonable person would not form a firm belief or conviction that Lupe Jr. cast his ballot for his father, Rivera.

The evidence also supports the inference that Illiana Guerrero cast her ballot for Rivera. In addition to her marriage to Rivera's son and campaign manager, the trial court speculated that Ms. Guerrero committed fraud by submitting voter registration applications and casting mail ballots in the names of her sister and brother-in-law (VI R.R. at 16). The court found that those fraudulently submitted ballots contained votes for Rivera (VI R.R. at 17). In analyzing Ms. Guerrero's claim to have only mistakenly registered to vote 316 West Los Torritos, the court stated that "[i]f the test was fraud, the Court would have an easier time in disallowing her vote" (VI R.R. at 22).[16] No reasonable person would not form a firm belief or conviction that Illiana Guerrero cast her ballot for her father-in-law, Rivera.

---

[15] (IV R.R. at 58-60).

[16] The trial court seems to indicate that it both believed Ms. Guerrero fraudulently submitted her voter registration *and* mistakenly registered at the wrong address. However, "one who knowingly misrepresents the location of his precinct will not thereafter, in the face of his fraud, be heard to say that he should be permitted to select his place of voting." *Graham v. Villarreal*, 242 S.W.2d 258, 260 (Tex. Civ. App.–San Antonio 1951, no writ). To the extent the trial court applied the law incorrectly, its conclusions should be reviewed *de novo*. *See supra*, note 11.

**D.  Lopez proved as a matter of law that an additional nine ballots were illegally cast by voters who resided outside District 5.**

The trial court erred in failing to find by clear and convincing evidence that an additional nine votes were illegally cast by nonresidents.[17]  Even considering all the evidence in the light most favorable to the lower court's finding, a "reasonable trier of fact could" not have "formed a firm belief or conviction that its finding was true" because "undisputed facts"[18] established as a matter of law that these voters have a "home and fixed place of habitation" outside District 5.  These voters will be discussed in groups according to the home at which they registered and voted.

### 1.  316 West Los Torritos

316 West Los Torritos is the home of appellant Rivera's own sister, Hortencia Cuellar.  (III R.R. at 90).  While the trial court has already invalidated five votes cast from this home, including that of Irma Rivera, it erred in failing to find that Irma's own husband Raul Rivera, Sr., and their children Illiana Yvonne Rivera and Raul Rivera, Jr. are likewise not residents of District 5.

316 W. Los Torritos has two bedrooms and one bathroom.  (*Id.* at 92).  One bedroom is the "bedroom that [Hortencia] sleep[s] in," and the other bedroom "is used for whenever [she] ha[s] any grandchildren to go to sleep there."  (*Id.* at 92:4-

---

[17] Those voters were:  (1) Delma Cadena, (2) Alexia Dinah Chavez, (3) Alyssa Domitria Chavez, (4) Delma Ann Chavez, (5) Diana Pena, (6) Valerie Jadine Pena, (7) Illiana Yvonne Rivera, (8) Raul Rivera, Sr., and (9) Raul Rivera, Jr. (Suppl. C.R. at 27-29).

[18] *See Gonzalez*, 251 S.W.3d at 775-76.

14). Hortencia Cuellar confirmed that nobody regularly stays in her home other than three grandchildren and Felipa Cuellar. (*Id.* at 92:14-17) (Q: [J]ust to make sure the record is clear, so besides Cassandra Alaniz, Corina Alaniz, Jesse Alaniz, and Felipa…nobody else regularly stays in the home? A: No. They come to visit, only).[19]

Hortencia further testified that Irma, Raul and their daughter Illiana Yvonne Rivera all live in a rent house:

> **Q: Where do they [Irma, Raul, and Illiana Yvonne] live right now, do you know?**
> A: No, I don't know where they live, I don't.
> **Q: But you know that they live in a rent house?**
> A: Yes, that I do know. I know that they live in a rent home.
> **Q: How is it that you know they live in a rent home, but you don't know where it is?**
> A: Because I speak with my brother, and he tells me that he's renting, but I—we talk, but I've never visited him, so I don't know his address, and that's the truth. I don't know where he lives.
> **Q: Okay. But your brother, Raul, you're referring to Raul, correct?**
> A: Yes, yes.
> **Q: And so he has told you that he's renting a home?**
> A: All the time. He has rented houses throughout his entire life.
> **Q: Including right now?**
> A: Yes, sir.

---

[19] While Hortencia testified unequivocally to facts establishing that she resides at 316 W. Los Torritos alone, even if this were not the case, the mere fact that ten individuals registered to vote at a home with only two bedrooms—only one of which is unoccupied—is inconsistent with the notion that the home is intended as a fixed habitation for all those claiming residency. *See McDuffee*, 327 S.W.3d at 823 (finding that the trial court could permissibly "consider the number of persons staying in the rooms as inconsistent with the notion that the living arrangements were intended as being permanent").

(III R.R. at 98:16-99:9). Ms. Cuellar further testified that Raul and Irma had stayed with her for a period of time about 15 years ago, but that since that time, they *have not ever come over to sleep*.

> **Q: So you said no. Is that Irma and Raul, either one of them come over to sleep?**
> A: No sir.
> **Q: And what about Illiana [Yvonne], does she ever come over and sleep there?**
> A: No.

(*Id.* at 100:9-13).

Not only do none of these individuals ever sleep over, but nobody besides Ms. Cuellar herself keeps any clothes or personal items at 316 West Los Torritos. (*Id.* at 101:8-22). Hortencia testified initially that nobody besides Hortencia receives mail at her home. (*Id.* at 108:23-25). Moreover, Ms. Cuellar testified that nobody has spoken to her about the possibility of moving into her home, and that she has no plans to sell her home. (*Id.* at 103:2-12). She was not even aware that any other individuals were registered to vote at the home. (*Id.* at 102:10-13).

Thus, the testimony of the homeowner at 316 West Los Torritos establishes that (1) none of these voters—including Irma, Raul, Sr., Raul, Jr., and Illiana Yvonne Rivera— have a presence at the home and that (2) they live in a rented home elsewhere. In fact, Ms. Cuellar testified directly—referring to Raul, Irma, and Illiana Yvonne—that "I don't know where they live, I don't." (*Id.* at 98:17).

*Appellant Rivera himself* testified that Irma and Raul Rivera reside at "Missouri Street," along with their children, whom Rivera identified as "Raul, Jr., Santos Rivera, and Illiana Rivera," except for one of the children who is married. (IV R.R. at 212:5-213:9).[20] These facts are uncontradicted, except by conclusory responses to leading questions, as noted below. Both Irma Rivera and Illiana Yvonne Rivera have represented to the Department of Public Safety that their residence is 105 ½ S. Missouri, Weslaco. (Contestant's Ex. 41).[21]

As a matter of law, the uncontradicted testimony of Hortencia and Appellant Rivera, and the public records, regarding Irma, Raul Sr., Raul, Jr., and Illiana Yvonne Rivera is *dispositive* in precluding any finding that any of those individuals meet the bodily presence element of residency. Lopez has instead adduced evidence—DPS records, and the testimony of appellant Rivera—that the family resides at 105 ½ S. Missouri.

---

[20] Appellant Rivera testified as follows:

**Q: And where do they [Irma & Raul Rivera] live?**
A: I wouldn't know. Missouri Street, or I really don't know their address, sir.
**Q: Okay. Just for the—did you say Missouri Street?**
A: Yeah.
…
**Q: …[W]hat are their children's names?**
A: Raul, Jr., Santos Rivera, and Illiana Rivera.
…
**Q: Do you know where these three children live?**
A: Well, I would imagine with the parents, or one of them they're married.

(IV R.R. at 212:5-213:9).

[21] This address lies in District 3, not District 5. (III R.R. at 127).

43

On cross-examination, Hortencia again admitted that Cassandra, Felipa, Illiana Yvonne Rivera, Irma and Raul Rivera rent homes elsewhere, but testified that her house is "the family house for the Rivera family, right? A: Yes." (III R.R. at 108:2-5). On re-direct, Hortencia was asked what she means by "family home." She responded:

> A: Well, what I mean is that 10 of us were born there, and, therefore, all of us 10, all of the 10 consider this as their home because they were born here."
> **Q: Okay. But I believe you said earlier that none of these individuals has spoken with you about moving into the home, is that correct?**
> A: Yes, because right now *they have their own home*, even though it's a rented home.
> **Q: Okay. And you said that sometimes Cassandra and Felipa and Illiana Yvonne, and Irma and Raul Rivera, sometimes they get mail at your home; is that true?**
> A: Yes, sometimes, not all the time.
> **Q: Can you remember the last time you got a piece of mail for any of those people?**
> A: Well, it's been months.

(*Id.* at 108:12-109:1) (emphasis added). As noted above, the "family home" reference in response to Rivera's counsel's lead on cross-examination is in the form of a legal conclusion and does not contradict the factual evidence of bodily presence adduced by Lopez.

A review of the trial court's discussion of the alleged nonresident voters reveals that the trial court accorded an inordinate amount of weight—even conclusive weight, it would appear—to the particular voter's voter registration

44

history. (VI R.R. 29-31). While this may be an appropriate factor *relevant* to a voter's residence, at least with respect to the *intent* element, it cannot alone determine domicile, and it cannot trump contrary evidence of actual *bodily presence* elsewhere. The trial court's analysis led it to the unlikely conclusion that while clear and convincing evidence established that Irma Rivera resided outside the district, there was not clear and convincing evidence that her husband Raul Rivera, Sr., or her two children, did not reside at 316 W. Los Torritos, even though direct testimony from two individuals and public records evidenced their actual Missouri Street residence.

### 2. 1518 East Sixth Street

This address is the home of Domitilia and Eusebio Cadena. Mr. Cadena testified in a deposition. Despite his claim that there are five (at most) bedrooms in the house (III R.R. at 111), twenty-three people were registered at the time of the contested election claiming this house as their residence (*See* Contestant's Ex. 40 at LL2125-79). The trial court did not find by clear and convincing that any of these voters do not reside there (Suppl. C.R. at 27-28).

#### a. *Diana Pena and Valerie Jadine Pena*

Diana Pena is the daughter of Eusebio and Domitilia Cadena, and Valerie Jadine Pena is Diana's daughter (III R.R. at 114). There is no evidence in the record to support the finding that Diana and Valerie Pena have established bodily

presence at 1518 E. 6th. The testimony of Eusebio Cadena—the owner of the home at 1518 E. 6th—precludes any finding that either of them reside at his home. Mr. Cadena testified that Diana rents her own home (III R.R. at 114:17-19) ("I don't know what the address is, but she does live here in Weslaco."), and he does not know whether Valerie lives with her mother in the home or not (III R.R. at 114-15) ("Well, I don't know because she is now going to school, or to college. And I don't know whether she is living with her or not."). Mr. Cadena also does not know where Valerie goes to school. (*Id*. at 115:20) ("I don't know where she goes."). If the owner of the home is unsure where a person stays at night, or where she attends college, then that person clearly does not stay at his house. Delma Cadena testified that while Diana Pena and Valerie Jadine Pena consider 1518 E. 6th their residence, "right now" they live at 1722 Christian Court (V R.R. at 73).

The entirety of the record demonstrates that, as a matter of law, Diana and Valerie Pena reside at 1722 Christian Court, Weslaco, which lies within District 2 (III R.R. at 127). Valerie Jadine Pena's DPS record shows she lives at that address (Contestant's Ex. 41), and process server Angela Salinas testified that while attempting to serve Valerie with a subpoena in this case, she left a note for Valerie at that address, and Valerie called her back to arrange a time to accept service (III R.R. at 79-81). Furthermore, even assuming that at some point in the past they had established presence at 1518 E. 6th, there is no demonstrable evidence to support a

finding that when they left that address, they *presently* intended to return to their former abode after a *temporary* absence. *See Tovar*, 994 S.W.2d at 762. Any such claimed intent would be inconsistent with the notion that the home is intended as a permanent residence in light of the facially suspicious number of individuals registered to vote there, *see McDuffee*, 327 S.W.3d at 823. Moreover, Diana and Valerie cannot claim to have future plans to move into the home, or any claim superior to those of Diana's nine siblings. (*See* III R.R. at 123-24) (Mr. Cadena has ten children, all still living, but no plans for any to inherit the home.). The trial court therefore abused its discretion in failing to find that Diana Pena and Valerie Jadine Pena reside outside District 5.

### b. *Delma Cadena and her daughters*

Delma Cadena is the daughter of Eusebio and Domitilia Cadena, and her daughters are Alexia Dinah Chavez, Alyssa Domitria Chavez, and Delma Ann Chavez. There is no evidence in the record to support the finding that Ms. Cadena and her daughters have established bodily presence at 1518 E. 6th. Ms. Cadena testified that she lives in a house she rents on Roosevelt Avenue, which is within District 5 but not in the same precinct as 1518 E. 6th (V R.R. at 72, 108-09). Her father confirmed this (III R.R. at 112). While she 'sometimes' will sleep or wash her clothes at 1518 E. 6th, her day-to-day activities are at the Roosevelt house (V R.R. at 74).

47

Ms. Cadena repeatedly emphasized that she and her daughters reside at 1518 E. 6th because that is "where our heart is" (V R.R. at 81, 82, 107). Even assuming, *arguendo*, this suffices for intent, it does not establish presence at 1518 E. 6th. The trial court erred in failing to consider the presence element, basing its finding on the fact that Ms. Cadena has consistently voted from that address (VI R.R. at 24). The court itself noted that, with regards to Ms. Cadena's daughters, "[t]hey have actually spent most nights at the[] address of their mother on Roosevelt, although, they've visited the 1518 East Sixth Street house regularly" (*Id*. at 25).

Lopez recognizes that her burden with respect to these voters, since they reside in District 5, is more onerous than with respect to the other nonresidents at issue. (*See* C.R. at 85-86 (citing Tex. Elec. Code §§ 11.003-.005)). However, the trial court erred in failing to find that Delma Cadena, Alexia Dinah Chavez, Alyssa Domitria Chavez, and Delma Ann Chavez reside at their rental home on Roosevelt. Because they reside there and did not update their voter registrations or complete a Statement of Residency when they voted, their votes were illegal and the trial court should have added those votes to the list of undetermined voters.

### E. Lopez proved as a matter of law that Esteban Martinez cast an illegal ballot for Rivera.

Despite Lopez's request (Suppl. C.R. at 33-34), the trial court did not find that Martinez's ballot contained a vote for Rivera (id. at 39).

Where testimony is clear, direct, positive, and uncontradicted by any other witnesses or attendant circumstances, it is taken as true as a matter of law. *See Flack v. First Nat'l Bank of Dalhart*, 226 S.W.2d 628, 633 (Tex. 1950).

Mr. Martinez testified that Rivera himself completed Martinez's ballot upon Martinez's instructions to vote for Rivera, and the trial court even noted that Martinez "testified that he voted for Rivera." (II R.R. at 204). This testimony was uncontradicted, and there is no evidence in the record to support the trial court's finding that it could not determine for whom Esteban Martinez's illegal vote was cast. On cross-examination, Rivera's counsel asked Mr. Martinez only whether the signature on the carrier envelope containing his ballot was his own (*Id.* at 205).

Additionally, with the exception of Mr. Martinez, of all the mail ballot votes the trial court found to both be illegal and contain votes for Rivera, either Rivera himself or Lupe Jr. completed the ballots for the voter (VI R.R. at 9-10).[22] In contrast, of all the mail ballot votes the trial court found to be illegal but could not determine for whom the votes were cast, someone other than Rivera or Lupe Jr. completed the ballots for the voter (VI R.R. at 11-12).[23] This Court should modify

---

[22] Those voters were: Marlen Martinez (II R.R. at 131-39), Andres Martinez (II R.R. at 139-48), Leonor Hinojosa (III R.R. at 32-40), Leocadia Ledesma (II R.R. at 148-58), David Lopez (II R.R. at 189-96), Emma Oviedo (III R.R. at 105-14), Noe Saldana (II R.R. at 185-89), Ruth Saldana (II R.R. at 172-85), Antonia Zepeda (III R.R. at 125-29), and Maria Berrones (IV R.R. at 47-60).

[23] Those voters were: Arnulfo Gonzalez (III R.R. at 27-32), Maria Garza Mendez (III R.R. at 97-104), Francisca Pina (III R.R. at 119-21), Liborio Pina (III R.R. at 121-22), and Pedro Zepeda (III R.R. at 130-34).

the judgment, deducting the vote of Esteban Martinez from Rivera's final vote count.

**III.  The Trial Court Abused its Discretion by Deducting Certain Illegal Votes From Lopez's Final Vote Count, Because There is Insufficient Evidence to Support the Finding That Those Votes Were Cast for Lopez.**

The trial court deducted the illegal votes of Tomasa Cavazos, Jose Luis Martinez, Sr. ("Jose Sr."), and Jose Luis Martinez, Jr. ("Jose Jr.") from Lopez's final vote count. The court abused its discretion in finding that these illegal votes were cast for Lopez because it erred in its application of discretion such that the finding is so arbitrary and unreasonable that it rises to the level of clear and prejudicial error of law.

**A.  Factual sufficiency review of issues upon which appellant did not have the burden of proof at trial.**

While Lopez had the burden to prove illegal votes were counted, she did not have the burden at trial to prove that any illegal votes were cast for herself. Rivera had that burden. In reviewing the factual sufficiency of an adverse finding on an issue for which the appellant did not have the burden of proof at trial, an appellate court considers all of the evidence, including evidence contrary to the finding, and sets aside the finding only if it is so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust. *See Croucher v. Croucher*, 660 S.W.2d 55, 58 (Tex. 1983); *Reese v. Duncan*, 80 S.W.3d 650, 655 (Tex. App.–

50

Dallas 2002, pet. denied). The court may conclude that a finding is against the overwhelming weight of the evidence even if the record contains some evidence to support the finding. *In re King's Estate*, 244 S.W.2d 660, 661 (Tex. 1951).

**B.** **The confidential nature of the electoral process requires heightened review of suspicious and biased voter testimony.**

As this Court has noted, by the confidential nature of the electoral process, only the voter knows how she actually voted, and her assertions are not readily controverted if untrue. *Medrano v. Gleinser*, 769 S.W.2d 687, 689-90 (Tex. App.–Corpus Christi 1989, no writ). While a trial court functioning as factfinder is the sole judge of the credibility of witnesses, the clear and convincing standard of proof in election contests requires an appellate court conducting a factual sufficiency review to take into consideration whether the evidence is strong enough that the factfinder could reasonably have formed a firm belief or conviction about the truth of the matters asserted by the the party with the burden of proof. *See In re J.F.C.*, 96 S.W.3d 256, 264 (Tex. 2002); *In re C.H.*, 89 S.W.3d 17, 25 (Tex. 2002); *Medrano*, 769 S.W.2d at 689.

A reviewing court should therefore take into careful consideration the likelihood that a voter who has been proven to have intentionally cast an illegal vote will testify that she voted for the candidate who challenged her vote, especially where that voter has a close relationship with the opposing candidate. Such a voter should not be presumed to have lied about how she cast her vote, but

when she has otherwise shown blatant disregard for the truth and integrity of the electoral process, her statements regarding how she voted cannot be the basis for a firm belief or conviction that she voted in the way she testified.

**C.     The record shows that basing any finding on the testimony of Tomasa Cavazos is clear error.**

No reasonable factfinder could form a firm belief or conviction that Tomasa Cavazos cast a vote for Lopez.  Ms. Cavazos's vote was one of the three votes deducted from Lopez's final vote count.  Each of these three votes was cast by a member of a single family with close ties to Rivera.  At the top of this family sits Margarito Martinez, Rivera's close friend and across-the-street neighbor of fifty years (VI R.R. at 14).  He is the father of Ms. Cavazos (VI R.R. at 14) and Mary Lou Garcia (III R.R. at 206).  Mary Lou Garcia is the owner of the home at 608 North Tio Street, where the other two votes deducted from Lopez were cast by Margarito's brother and nephew, Jose Sr. and Jose Jr. (II R.R. at 25, 28).  This is a very united, close-knit family (II R.R. at 44) that, Tomasa admitted, supported Rivera (V R.R. at 42:7-21).

Tomasa Cavazos actually lives with her husband outside the limits of all Weslaco city commission districts (VI R.R. at 19), but she registered to vote at her father's residence across the street from Rivera (V R.R. at 37).  Michelle Carpenter—best friend of Ms. Cavazos' recently-deceased daughter Crystal—testified on the first day of trial that Ms. Cavazos lives at 5617 FM 88 (II R.R. 77),

52

which was confirmed by Ms. Cavazos's uncle that same day (II R.R. at 62). By the time she testified, there was overwhelming evidence that Ms. Cavazos resides outside District 5.

Tomasa Cavazos' entire testimony is incredible. She appeared at the courthouse on the fourth day of trial without having been subpoenaed, claiming she had not even been asked to testify and was there completely voluntarily (V R.R. at 60). She stated that the only time she had ever spoken with Rivera's counsel was right before she took the stand, to briefly ask if he was the person she was "supposed to talk to" if she wanted to testify (V R.R. at 60-61). Rivera put her on the stand, supposedly without knowledge of any of the substance of what she wanted to say and without having expressed any previous desire to call her to testify. While the record contains no evidence that Rivera is a gambling man, he might want to consider taking it up, because he hit the jackpot with Tomasa Cavazos.

Rivera questioned Ms. Cavazos in a way that at first glance seemed to defend against Lopez's attacks against her residency, and Ms. Cavazos vehemently asserted that her true residence is in fact the house across the street from her father's best friend of fifty years (V R.R. at 37-39).[24] However, despite the fact

---

[24] A review of the deposition of Margarito Martinez not only provides some comic relief, but reveals direct contradictions between his testimony and that of Tomasa Cavazos. Both claimed repeatedly that Mr. and Mrs. Cavazos reside at 717 N. Padre, but the trial court was unpersuaded.

that Lopez had already presented ample testimony that Ms. Cavazos does not actually reside there, Rivera asked her how she voted (V R.R. at 43). If it was Rivera's honest contention that Ms. Cavazos indeed resided at 717 North Padre, then the question of how she voted would be unnecessary. It was not his burden to prove how a voter voted if he contended that vote was legal. In fact, unless he knew her answer in advance, asking her that question could have proven fatal to his case.

Ms. Cavazos knew exactly what she was doing. She knew that her vote was going to be thrown out. She proved her blatant disregard for the truth and the integrity of the electoral process merely by voting as a nonresident of the district, and then again on the stand. She put on a good show, coyly demurring when first questioned about how she voted, then immediately switching to a confident declaration that she voted for Lopez (V R.R. at 43). Despite the fact that she volunteered to testify, she expressed anger that she was being forced to come to court and say how she voted (V R.R. at 44).

The trial court determined that Ms. Cavazos' testimony regarding her residence was untrue, throwing out her vote (VI R.R. at 19). While this meant that the court disbelieved every material factual contention she made other than how she voted, the court nevertheless credited the one statement that she made to insure against Rivera's loss. Allowing Tomasa Cavazos first to subvert the law by voting

illegally and then by crediting her self-interested testimony to mitigate the effects of that illegal vote is manifestly unjust. It was so arbitrary and unreasonable that it rose to clear error.

### D. The record shows that basing any finding on the testimony of Jose Jr. and Jose Sr. is clear error.

Jose Jr. and his father live in Mercedes but voted in the Weslaco District 5 race anyway (VI R.R. at 17). They claimed residence at the home their cousin Mary Lou Garcia (II R.R. at 25), who is Margarito Martinez's daughter (III R.R. at 206). Jose Jr. readily admitted he does not reside in Weslaco but purposefully claimed residence there (II R.R. at 29). He expressed no remorse or otherwise indicated he knew what he did was wrong, except to express regret at having voted for Lopez because she challenged his illegal vote (II R.R. at 29-30).

Jose Jr. volunteered his testimony that he voted for Lopez without even being asked (II R.R. at 29). He first gave vague reasons for voting for her, such as general statements regarding taxes and that Lopez might "do better for the city" (II R.R. at 29), but then got more specific: Jose Jr. submitted a fraudulent voter registration application and voted in an election in city where he does not reside in order to reward Lopez for providing refreshments and food when his cousin died (II R.R. at 29).

Both Jose Jr.'s and Jose Sr.'s cross-examinations by Rivera's counsel shows they intended their testimony to serve Rivera's interests. Each agreed with every

single leading question posed to him (II R.R. at 33-36, 43-47, 59-61, 63-65), even when those questions contradicted their direct testimony (*Compare* II R.R. at 37, *with* II R.R. at 45-46) (Jose Jr. discussing Tomasa Cavazos's address). This allowed Rivera to introduce evidence that insulated himself from the actual instances of fraud Lopez proved won him the election. Like their cousin Tomasa, they knew they were safe from impeachment regarding how they voted.

This court should reverse the trial court's finding that Tomasa Cavazos, Jose Luis Martinez, Jr. and Jose Luis Martinez Sr. voted for Lopez, adding those votes back to Lopez's total, and place those three votes in the illegal but undetermined category.

## IV. The Trial Court Abused Its Discretion by Subtracting Four Undervotes, Rather Than One, From the Total of Illegal but Undetermined Votes Cast In This Contest.

To ensure that all the ballots the trial court found to be illegal actually contained a vote in the District 5 race, the court subtracted four ballots cast by District 5 voters from the total of eleven undetermined illegal votes.[25] (Suppl. C.R. at 31). For two of those subtractions, however, there was no evidence to support the trial court's finding. It was clear and prejudicial error to subtract four votes

---

[25] *See* discussion*, supra* at note 1.

instead of (at most) two. This issue is properly presented on appeal. (C.R. at 188; Suppl. C.R. at 37, 39).[26]

The canvass report reflects that among all the ballots cast by District 5 voters in November 2013, there were four ballots that did not contain a vote for either candidate in the District 5 race (that is, four "undervotes" in the contested election). (Contestant's Ex. 18). However, all 170 ballots cast from District 5 voters *by mail* contained a vote in the District 5 race. *See id.* (discussed at C.R. 188 n.1). That is, there were no undervotes in the ballots by mail. Consequently, the evidence establishes that the seven illegal but undetermined ballots *cast by mail* contained a vote in the District 5 race, although the evidence does not reveal for whom that vote was cast.[27] The four undervotes reflected in the canvass report all came from ballots cast in person, either early or on Election Day.

District 5 is comprised of only three precincts: 57, 112 and 186. The canvass report shows that the undervotes were as follows:

- Precinct 57: one (1) undervote (cast early in person)
- Precinct 112: two (2) undervotes (one was cast early in person and one was cast on Election Day in person)

---

[26] Lopez argued below that the court improperly subtracted the Precinct 57 undervote, pointing out that none of the residency challenges were to Precinct 57 voters. Upon further analysis, when one removes the seven undetermined ballots by mail, and recognizes that the remaining four undetermined but illegal votes all originate from Precinct 112, it is clear that the canvass report compels the conclusion urged here—that at most two undervotes should be subtracted from the eleven undetermined illegal votes found below. It is appropriate to raise this issue on appeal because the evidence supporting this conclusion is in the record and uncontradicted.

[27] (Suppl. C.R. at 25 ¶4).

- Precinct 186: one (1) undervote (cast early in person)

(Contestant's Ex. 18).

Since the evidence reveals that all ballots by mail contained votes in the contested race, the undervotes reflected in the canvass report cannot be among the ballots that were cast by mail; if anything, they can only be among the ballots challenged by Lopez on the basis of residency.[28] Setting aside the seven ballots by mail (since there are no undervotes among them), there are only four other ballots the trial court found to be illegal but with undetermined votes: those of Noe Cavazos, Felipa Cuellar, Cassandra Alaniz, and Irma Rivera. (VI R.R. at 19, 27-29). **All of these voters were registered in Precinct 112.** (Contestant's Ex. 19 (documents Bates-labeled LL218 (combination form reflecting Noe Cavazos's vote); LL181 (Felipa Cuellar); LL215 (Irma Rivera); LL322 (Cassandra Alaniz))); *see also* (Contestant's Ex. 37 (spreadsheet reflecting voter information)). **Moreover, all of them voted early, not on Election Day.** *Id.* Given the close familial relationships and other suspicious circumstances (Felipa's, Cassandra's and Irma's applications to register at 316 W. Los Torritos were only signed Sept. 5,

---

[28] Of the five residential addresses from which Lopez alleges nonresidents voted, four are in Precinct 112 (316 W. Los Torritos; 716 N. Padre; 717 N. Padre; 608 N. Tio) and one is in Precinct 186 (1518 E. 6th St.). (*See, e.g.*, Contestant's Ex. 19 at LL178 (Lupe Jr.); LL181 (Felipa Cuellar); LL218 (Noe Cavazos); LL491 (Jose Luis Martinez, Sr.); LL176 (Delma Cadena)).

2013),[29] it is almost certain that each of these voters cast a vote for Appellant Rivera. However, setting that aside, the canvass report conclusively establishes that of these four voters' ballots, there could only have been one that did not contain a vote in the contested race.

There was, therefore, no evidence to support the trial court's finding that three undervotes could be among the eleven undetermined illegal votes. Consequently, there can at most be one undervote among the undetermined and uncountable ballots at issue in this case. The trial court abused its discretion by subtracting the three additional votes.

## PRAYER

For all the foregoing reasons, the trial court erred in its final judgment. Lopez hereby requests that this Court reverse the erroneous findings identified above and enter and/or render judgment consistent with the foregoing arguments. The final vote count, after adjusting for the errors of the trial court, should be 471[30] votes for Leticia Lopez and 468[31] votes for Guadalupe Rivera, with 22 undetermined voters, and a proper accounting for any undervotes that could

---

[29] (Contestant's Ex. 40) (voter registration records).

[30] Adding back Tomasa Cavazos, Jose Luis Martinez, Sr., and Jose Luis Martinez, Jr. to her total.

[31] Deducting Esteban Martinez (previously illegal but undetermined), Lupe Rivera, Jr., and Illiana Guerrero.

potentially be among the specific ballots in the undetermined category, as outlined above.[32]

## CERTIFICATE OF COMPLIANCE

Based on the word count provided by the computer program used to prepare this petition, below-signed counsel states that the number of words in the document is 14,970.

Respectfully submitted,

*[signature]*

_____
Jerad Wayne Najvar
Texas Bar No. 24068079
NAJVAR LAW FIRM
4151 Southwest Freeway, Suite 625
Houston, TX 77027
281.404.4696 phone
281.582.4138 fax
jerad@najvarlaw.com
*Counsel for Appellee/Cross-Appellant*
LETICIA "LETTY" LOPEZ

---

[32] The previous total of 11, less Esteban Martinez (now deducted from Rivera's total), plus Tomasa Cavazos, Jose Luis Martinez Jr. & Sr., plus nine (9) additional invalid votes (Raul Rivera Sr. & Jr., Illiana Yvonne Rivera, Delma Cadena, Alexia, Alyssa, and Delma Chavez, Diana Pena, and Valerie Jadine Pena).

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of this **BRIEF OF CROSS-APPELLANT** has been served by eService on the following counsel of record on December 29, 2014.

Gilberto Hinojosa
622 E. St. Charles St
Brownsville, TX 78520
*Counsel for Appellant/Cross-Appellee*
GUADALUPE "LUPE" RIVERA

_____

# APPENDIX
A

No. C-6914-13-G

| | |
|---|---|
| LETICIA LOPEZ<br>Contestant | IN THE DISTRICT COURT |
| V. | 370TH JUDICIAL DISTRICT OF |
| LUPE RIVERA<br>Contestee | HIDALGO COUNTY, TEXAS |

## FINAL JUDGMENT

On March 24 - 27, 2014, the court proceeded pursuant to Title 14 of the Texas Election Code to conduct a trial to ascertain whether the outcome of the contested election in the above cause, for Weslaco City Commission District 5, for which Election Day was November 5, 2013, as shown by the final canvass is not the true outcome of the contested election.

Contestant Leticia Lopez appeared in person and thorough her attorney, Jerad Najvar, and announced ready for trial. Contestee Guadalupe Rivera appeared in person and through his attorney, Gilberto Hinojosa, and announced ready for trial. After hearing the evidence and the arguments presented, the court renders judgment for Contestant.

The court finds that contestant Lopez has proven by clear and convincing evidence that the outcome of the contested election as shown by the final canvass is not the true outcome because illegal votes were counted in a number in excess of the margin of victory, materially affecting the outcome of the election.

IT IS THEREFORE ORDERED, ADJUDGED, DECLARED AND DECREED that

1. The results as shown by the final canvass of the contested election for the City

240

of Weslaco Commission District 5 held on November 5, 2013 are hereby declared VOID.

2. The city of Weslaco is hereby ORDERED to conduct a new election on a date to be set by this court after this judgment becomes final. The candidates in the new election are the same candidates who were in this contested election, Leticia Lopez and Guadalupe Rivera.

3. Contestee Rivera pay all costs incurred in this action, for which execution may issue.

4. The trial court declines to accelerate appeal in a general election and defers to the appellate court if an appeal is perfected due to the appellate court's superior knowledge of reasonable ways to shorten their normal deadlines.

5. The district court retains jurisdiction of the contest until the new election is completed and may make any orders the court considers necessary to ensure its proper conduct.

The court denies all relief not granted in this judgment. This is a final judgment.

SIGNED on _July 25_, 2014

_____
HONORABLE MENTON MURRAY, JR.

APPENDIX
B

FILED

AT 10.00 O'CLOCK A M

OCT 27 2014

LAURA HINOJOSA, CLERK
District Courts, Hidalgo County
IN THE DISTRICT COURT    Deputy#13

No. C-6914-13-G

| | | |
|---|---|---|
| LETICIA LOPEZ | § | |
| Contestant, | § | |
| | § | |
| v. | § | 370TH JUDICIAL DISTRICT |
| | § | |
| LUPE RIVERA | § | |
| Contestee | § | OF HIDALGO COUNTY, TEXAS |

## PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

On August 14, 2014, Contestee Lupe Rivera filed his request for this Court to make Findings of Fact and Conclusions of Law. Pursuant to Texas Rule of Civil Procedure 296, the Court makes the following findings of fact and conclusions of law:

### A. Background

1. On November 5, 2013, the City of Weslaco, Hidalgo County, Texas, held a general election for the District 5 seat on the Weslaco City Commission. The two candidates in the District 5 election were the incumbent, Contestee Lupe Rivera, and the challenger, Contestant Leticia Lopez. The final canvass of the election showed that a total of 958 votes were cast, with Contestee receiving 487 votes and Contestant receiving 471 votes, creating a sixteen (16) vote margin of victory for Contestee.

2. From March 24 through 27, 2014 at the county courthouse in Edinburg, Hidalgo County, Texas, the Court proceeded pursuant to Title 14 of the Texas Election Code to conduct a bench trial to ascertain whether the outcome of the contested election, as shown by the final canvass, was not the true outcome of election. During said trial, the Court considered live testimony from thirty witnesses, deposition testimony from sixteen witnesses, and numerous exhibits of documentary evidence.

Page 1 of 11

22

## B. Findings of Fact as to Contestant's Challenges Based on Ballot by Mail Violations

3. The Court finds by clear and convincing evidence that thirteen (13) voters each cast a ballot by mail containing a vote for Contestee Lupe Rivera in the election and gave their ballots to another person for placement in the mail, and that the person(s) who took these voters' ballots to be mailed did not sign the carrier envelopes, nor did they print their names and addresses on the carrier envelopes. Those voters are: Maria Berrones, Marlen Martinez, Andres Martinez, Leonor Hinojosa, Leocadia Ledesma, David Lopez, Emma Oviedo, Noe Saldana, Ruth Saldana, Antonia Zepeda, Eulalio Ibanez, Tiburcio Mata, and Oralia Saldana.

4. With respect to Maria Berrones's mail in ballot, the Court finds Ms. Berrones's testimony to be credible that Ms. Berrones gave her ballot to Contestee Lupe Rivera at her home, that Mr. Rivera filled out her ballot for her and took her ballot to be mailed without signing the carrier envelope and without printing his name and address on the carrier envelope. The Court finds Contestee Rivera's testimony that he was not the person who completed and took Ms. Berrones's ballot to the mail, to not be credible.

5. The Court finds by clear and convincing evidence that seven (7) voters each cast an absentee ballot by mail in the Election and gave their ballots to another person for placement in the mail, and that the person(s) who took these voters' ballots to be mailed did not sign the carrier envelopes and did not print their names and addresses on the carrier envelopes. Those voters are: Arnulfo Gonzalez, Esteban Martinez, Sr., Jose Mendez, Maria Garza Mendez, Francisca Pina, Liborio Pina, and Pedro Zepeda. The Court cannot, however, determine by clear and convincing evidence for whom these seven voters cast their ballots.

| | | |
|---|---|---|
| LETICIA LOPEZ | § | IN THE DISTRICT COURT |
| Contestant, | § | |
| | § | |
| V. | § | 370TH JUDICIAL DISTRICT |
| | § | |
| LUPE RIVERA | § | |
| Contestee. | § | OF HIDALGO COUNTY, TEXAS |

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

In Response to Request of Contestee in this cause, the Court makes and files the following as its findings of fact and conclusions of law.

**A. Findings of Fact on Contestant's Challenge to Voters Who Cast Their Votes By Mail Ballots**

1. The Court finds by clear and convincing evidence that none of the persons that obtained a mail-in ballot or carrier envelope from a voter, listed herein, were related within the degree of affinity or consanguinity with the voter nor were registered to vote at the same address as the voter, nor were they county clerks for Hidalgo County, Texas, postal employees and/or common carriers.

2. The Court finds by clear and convincing evidence that the following twelve (12) voters cast their mail-in ballots for Contestee Lupe Rivera and the person who delivered the mail-in ballots to be mailed did not provide his/her signature, nor print his/her name and address on the carrier envelope: Marlen or Marlene Martinez, Andres Martinez, Leonor Hinojosa, Leocadia Ledesma, David Lopez, Emma Oviedo, Noe Saldana, Ruth Saldana, Antonia Zepeda, Eulalio Ibanez, Tiburcio Mata and Oralia Saldana.

3. The Court finds by clear and convincing evidence that Maria Berrones cast her vote by

24

mail-in ballot, did not testify for whom she voted, but did testify that she gave her ballot to Contestee Lupe Rivera, who filled out her ballot for her and mailed her ballot without signing the carrier envelope and without printing his name and address on the carrier envelope. The Court will find by clear and convincing evidence that Maria Berrones cast her vote for Lupe Rivera.

4.     The Court finds by clear and convincing evidence that the following seven (7) voters cast their vote by mail-in ballots and the person who delivered the mail-in ballots did not provide his/her signature, nor print his/her name and address on the carrier envelope: Arnulfo Gonzalez, Esteban Martinez, Sr., Jose Mendez, Maria Garza Mendez, Francisca Pina, Liborio Pina, and Pedro Zepeda. The Court could not determine by clear and convincing evidence for whom the seven (7) voters of these mail-in ballots cast their votes.

5.     As to the remaining voters alleged to have improperly cast main-in ballots, the Court does not find by clear and convincing evidence that any of the remaining challenged mail-in ballots were improperly cast.

**B.     Conclusions of Law to to Challenge to Voters Who Cast Their Votes By Mail Ballots**

1.     Section 86.051(b) of the Texas Elections Code provides that "[a] person other than the voter who deposits the carrier envelope in the mail or with a common or contract carrier must provide the person's signature, printed name, and residence address on the reverse side of the envelope." Violations of Section 86.051(b) of the Texas Elections Code renders a ballot uncountable under Section 86.006(h) of the Texas Elections Code.

2.     Therefore, the ballots of the voters listed in paragraphs A2, A3 and A4 above shall not be counted and shall be deducted from the final vote totals in the District 5 Weslaco City Commission Race in the following manner:

(a)     The twelve (12) mail-in ballots described in paragraph A2 where the voter

testified that he/she voted for Lupe Rivera will be deducted from the total vote for Contestee, Lupe Rivera.

(b) The mail-in ballot that was cast Maria **Berrones** as described in paragraph A3 which this court found by clear an convincing evidence was cast for Lupe Rivera will be deducted from the total vote for the Contestee, Lupe Rivera.

(c) The seven (7) mail-in ballots described in paragraph A4 which this Court could not determine by clear and convincing evidence who the voter voted for will be deducted from the from the final vote totals.

**C.** **Findings of Fact on Contestant's Challenge of voters due to the non-residence of the voter in the district during this election**

1. The Court finds by clear and convincing evidence that Jacqueline Garcia and Ricardo Garcia, who are registered and claim their residence at 316 Los Toritos, Weslaco, Hidalgo County, Texas, reside in Mercedes, Hidalgo County, Texas, and are not residents of District 5 Weslaco, Hidalgo County, Texas;

2. The Court finds by clear and convincing evidence that Jacqueline Garcia and Ricardo Garcia cast their votes for Contestee Lupe Rivera;

3. The Court finds by clear and convincing evidence that Jose Luis Martinez, Sr., and Jose Luis Martinez, Jr., reside in Mercedes, Hidalgo County, Texas, and are not residents of District 5 Weslaco, Hidalgo County, Texas.

4. The Court finds by clear and convincing evidence that Jose Luis Martinez, Sr., and Jose Luis Martinez, Jr., cast their votes for Contestant Letty Lopez.

5. The Court finds by clear and convincing evidence that Jose Roberto Sandoval is not a resident of District 5 Weslaco, Hidalgo County, Texas.

26

6. The Court finds by clear and convincing evidence that Jose Roberto Sandoval cast his vote for Contestee Lupe Rivera.

7. The Court finds by clear and convincing evidence that Tomasa Cavazos and Noe Cavazos are not residents of District 5 Weslaco, Hidalgo County, Texas.

8. The Court finds by clear and convincing evidence that Tomasa Cavazos cast her vote for Contestant Letty Lopez, but it is undetermined for whom Noe Cavazos voted.

9. As to Lupe Rivera, Jr., and his common law wife, Illiana Guerrero Rivera, the Court finds by clear and convincing evidence that Illiana Guerrero Rivera does not reside at 316 Los Torritos, Weslaco, Hidalgo County, Texas. The Court does not find by clear and convincing evidence that Lupe Rivera, Jr., and his common law wife, Illiana Guerero Rivera are not residents of District 5, Weslaco, Hidalgo County, Texas.

10. As to Delma Cadena, the Court does not find by clear and convincing evidence that she is not a resident of 1518 East 6th Street, Weslaco, Hidalgo County, Texas, and that she is not a resident of District 5, Weslaco, Hidalgo County, Texas.

11. As to Alexia Cadena, Alyssa Cadena and Delma Chavez, daughters of Delma Cadena, the Court does not find by clear and convincing evidence that they are not residents of 1518 East 6th Street, Weslaco, Hidalgo County, Texas, and that they are not residents of District 5, Weslaco, Hidalgo County, Texas.

12. As to Osmel Cadena, the Court does not find by clear and convincing evidence that he is not a resident of 1518 East 6th Street, Weslaco, Hidalgo County, Texas, and that he is not a resident of District 5, Weslaco, Hidalgo County, Texas.

13. As to Diana Cadena Pena, the Court does not find by clear and convincing evidence that she is not a resident of 1518 East 6th Street, Weslaco, Hidalgo County, Texas, and that

she is not a resident of District 5, Weslaco, Hidalgo County, Texas.

14. As to Valerie Jadine Pena, the Court does not find by clear and convincing evidence that she is not a resident of 1518 East 6th Street, Weslaco, Hidalgo County, Texas, and that she is not a resident of District 5, Weslaco, Hidalgo County, Texas.

15. As to Felipa Cuellar, the Court finds by clear and convincing evidence that she is not a resident of 316 West Los Torritos, Weslaco, Hidalgo County, Texas, and that is not a resident of District 5, Weslaco, Hidalgo County, Texas.

16. As to Felipa Cuellar, Court does not find by clear and convincing evidence for whom she voted and therefore her vote is undetermined.

17. As to Cassandra Renea Alaniz, the Court finds by clear and convincing evidence that she is not a resident of 316 West Los Torritos, Weslaco, Hidalgo County, Texas, and that she is not a resident of District 5, Weslaco, Hidalgo County, Texas.

18. As to Cassandra Renea Alaniz, Court does not find by clear and convincing evidence for whom she voted and thereforet her vote is undetermined.

19. As to Raul Rivera, Sr., the Court does not find by clear and convincing evidence that he is not a resident of 316 West Los Torritos, Weslaco, Hidalgo County, Texas, and that he is not a resident of District 5, Weslaco, Hidalgo County, Texas.

20. As to Irma Rivera, the Court finds by clear and convincing evidence she is not a resident of 316 West Los Torritos, Weslaco, Hidalgo County, Texas, and that she is not a resident of District 5, Weslaco, Hidalgo County, Texas.

21. As to Irma Rivera, Court does not find by clear and convincing evidence for whom she voted and therefore her vote is undetermined.

22. As to Illiana Yvonne Rivera, the Court does not find by clear and convincing evidence

that she is not a resident of 316 West Los Torritos, Weslaco, Hidalgo County, Texas, and that she is not a resident of District 5, Weslaco, Hidalgo County, Texas.

23. As to Raul Rivera, Jr., the Court does not find by clear and convincing evidence that he is not a resident of 316 West Los Torritos, Weslaco, Hidalgo County, Texas, and that he is not a resident of District 5, Weslaco, Hidalgo County, Texas.

24. As to Laura Rivera, the Court does not find by clear and convincing evidence that she is not a resident of 716 North Padre, Weslaco, Hidalgo County, Texas, and that she is not a resident of District 5, Weslaco, Hidalgo County, Texas.

**D.     Conclusions of Law on Contestant's Challenge of voters due to the non-residence of the voter in the district during this election**

1. Section 1.015, of the Texas Elections Code defines Residence as follows:

"(a)     In this code, "residence" means domicile, that is, one's home and fixed place of habitation to which one intends to return after any temporary absence.

(b)     Residence shall be determined in accordance with the common-law rules, as enunciated by the courts of this state, except as otherwise provided by this code.

(c)     A person does not lose the person's residence by leaving the person's home to go to another place for temporary purposes only.

(d)     A person does not acquire a residence in a place to which the person has come for temporary purposes only and without the intention of making that place the person's home."

2. Jacqueline Garcia and Ricardo Garcia are not residents of District 5 Weslaco, Hidalgo County, Texas and therefore their votes are disallowed and since this Court has found that they

29

cast their votes for Contestee Lupe Rivera, their votes will be deducted from Contestee Lupe Rivera's total vote.

3. Jose Luis Martinez, Sr., and Jose Luis Martinez, Jr., are not residents of District 5 Weslaco, Hidalgo County, Texas and therefore their votes are disallowed and since this Court has found that they cast their votes for Contestant Letty Lopez, their votes will be deducted from Contestant Letty Lopez' total vote.

4. Jose Roberto Sandoval is not a resident of District 5 Weslaco, Hidalgo County, Texas and therefore his vote is disallowed and since this Court has found that he cast his vote for Contestee Lupe Rivera, his vote will be deducted from Contestee Lupe Rivera's total vote.

5. Tomasa Cavazos and Noe Cavazos are not residents of District 5 Weslaco, Hidalgo County, Texas and therefore their votes are disallowed. Since this Court has found that Tomasa Cavazos cast her vote for Contestant Letty Lopez, her vote will be deducted from Contestant Letty Lopez' total vote.

6. Felipa Cuellar, Cassandra Renea Alaniz, and Irma Rivera , are not residents of District 5, Weslaco, Hidalgo County, Texas and therefore their votes are disallowed.

7. Because the Court has not found by clear and convincing evidence that Lupe Rivera, Jr., Illiana Guerrero Rivera, Delma Cadena, Alexia Cadena, Alyssa Cadena, Delma Chavez, Osmel Cadena, Diana Cadena Pena, Valerie Jadine Pena, Raul Rivera, Sr., Illiana Yvonne Rivera, Raul Rivera, Jr., and Laura Rivera are not residents of District 5 Weslaco, Hidalgo County, Texas, this Court overrules Contestant's challenge to these voters and holds that their votes may be counted.

E. Findings of Fact and Conclusions of law on the Seven (7) mail-ballots that were rejected by the Hidalgo County Ballot Board.

1. Seven (7) mail-in ballots were rejected by the Hidalgo County Ballot Board for the

reason that the signatures on the application for mail ballot did not match the signature on the carrier envelope.

2.   The voters of the seven (7) rejected mail-in ballots testified in Court that each voter signed their respective application for a mail ballot and the carrier envelope and that each voted for Contestee Lupe Rivera, seven (7) votes.

3.   The Court does not find by clear and convincing evidence that that the Hidalgo County Ballot Board mistakenly rejected the seven (7) ballots.

4.   Therefore the seven (7) mail-in ballots that were rejected by the Hidalgo County Ballot Board for the reason that the signatures on the application for mail ballot did not match the signature on the carrier envelope will not be counted.

## F.   Findings of Fact and Conclusion of Law on the Under-Vote in the Weslaco City Commission Election.

1.   The Court finds by clear and convincing evidence that four (4) voters did not cast a ballot for City Commissioner District 5, Weslaco, Hidalgo County, Texas.

2.   At least eleven (11) undetermined votes were cast in City Commissioner District 5, Weslaco, Hidalgo County, Texas.

3.   Therefore at least seven (7) undetermined votes remain.

## G.   Findings of Fact and Conclusions of Law on Court's Final Ruling

1.   The original tally of the votes for Contestant Letty Lopez was 471, while the original tally of votes for Contestee Lupe Rivera was 487.

2.   The final tally of votes, after deducting the disallowed votes for each candidate, is Contestant Letty Lopez 468, Contestee Lupe Rivera 471, and 7 undetermined votes.

31

3. The Court is unable to declare a winner in the race of City Commissioner District 5 Weslaco, Hidalgo County, Texas, and calls for a new election between Contestant Letty Lopez and Contestee Lupe Rivera.

Signed October 27, 2014.

_____
JUDGE PRESIDING

32

# APPENDIX
# C

Vernon's Texas Statutes and Codes Annotated
  Election Code (Refs & Annos)
    Title 1. Introductory Provisions
      Chapter 1. General Provisions (Refs & Annos)

V.T.C.A., Election Code § 1.015

§ 1.015. Residence

[Currentness]

(a) In this code, "residence" means domicile, that is, one's home and fixed place of habitation to which one intends to return after any temporary absence.

(b) Residence shall be determined in accordance with the common-law rules, as enunciated by the courts of this state, except as otherwise provided by this code.

(c) A person does not lose the person's residence by leaving the person's home to go to another place for temporary purposes only.

(d) A person does not acquire a residence in a place to which the person has come for temporary purposes only and without the intention of making that place the person's home.

(e) A person who is an inmate in a penal institution or who is an involuntary inmate in a hospital or eleemosynary institution does not, while an inmate, acquire residence at the place where the institution is located.

**Credits**
Acts 1985, 69th Leg., ch. 211, § 1, eff. Jan. 1, 1986. Amended by Acts 1997, 75th Leg., ch. 864, § 4, eff. Sept. 1, 1997.

Notes of Decisions (141)

V. T. C. A., Election Code § 1.015, TX ELECTION § 1.015
Current through the end of the 2013 Third Called Session of the 83rd Legislature

**End of Document** © 2014 Thomson Reuters. No claim to original U.S. Government Works.

# APPENDIX
# D

---

Vernon's Texas Statutes and Codes Annotated
  Election Code (Refs & Annos)
    Title 2. Voter Qualifications and Registration
      Chapter 11. Qualifications and Requirements for Voting (Refs & Annos)

V.T.C.A., Election Code § 11.001

§ 11.001. Eligibility to Vote

Effective: September 1, 2005
Currentness

(a) Except as otherwise provided by law, to be eligible to vote in an election in this state, a person must:

(1) be a qualified voter as defined by Section 11.002 on the day the person offers to vote;

(2) be a resident of the territory covered by the election for the office or measure on which the person desires to vote; and

(3) satisfy all other requirements for voting prescribed by law for the particular election.

(b) For a person who resides on property located in more than one territory described by Subsection (a)(2), the person shall choose in which territory the residence of the person is located.

**Credits**
Acts 1985, 69th Leg., ch. 211, § 1, eff. Jan. 1, 1986. Amended by Acts 2005, 79th Leg., ch. 1107, § 1.06, eff. Sept. 1, 2005.

Notes of Decisions (41)

V. T. C. A., Election Code § 11.001, TX ELECTION § 11.001
Current through the end of the 2013 Third Called Session of the 83rd Legislature

---

**End of Document**

© 2014 Thomson Reuters. No claim to original U.S. Government Works.